**LDG TIMBER ENTERPRISES, INC., Appellant,**

v.

**Dan GLICKMAN, Secretary Of Agriculture, Appellee.**

No. 96–1139.

United States Court of Appeals, Federal Circuit.

June 4, 1997.

David A. Linn, Linn, Lindley & Blate, Oakhurst, CA, argued for appellant.

Deborah A. Bynum, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., argued for appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Assistant Director.

Before ARCHER, Chief Judge, SMITH, Senior Circuit Judge, and NEWMAN, Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

LDG Timber Enterprises, Inc. (LDG) appeals the decision of the United States Department of Agriculture Board of Contract Appeals, AGRBCA Nos. 91–213–1 and 95–228–R,[1] denying LDG's claim for damages based on certain timber contracts in national forests. We affirm the Board's judgment.

---

1. *LDG Timber Enterprises, Inc.,* 95–2 BCA 27,-906, 1995 WL 505631 (Aug. 22, 1995); *LDG* *Timber Enterprises, Inc.,* 96–1 BCA 28,049, 1995 WL 683175 (Nov. 17, 1995).

## BACKGROUND

This case concerns the relationship between two timber contracts: the Blacksmith Timber Sale in the Sierra National Forest and the Boundary Timber Sale in the Sequoia National Forest. LDG's performance of the Blacksmith contract was required to be completed by June 25, 1988, and the Boundary contract by March 31, 1992. During the summer of 1987, while LDG was logging the Blacksmith area, a fire occurred at the Boundary area. The Forest Service estimated that 40% of the remaining Boundary timber would die because of insect infestation and other events that follow a forest fire. LDG, with the agreement of the Forest Service, transferred its operations in the fall of 1987 to the Boundary sale area in order to harvest and salvage the remaining timber. In view of this transfer of operations, various time extensions to the Blacksmith contract ensued. The Forest Service refused to extend the Blacksmith contract beyond October 15, 1989, leading to this dispute.

The extensions to the Blacksmith contract were documented as follows: By letter of March 10, 1988 the Forest Service, through Contracting Officer Moyle, wrote that the twenty-five days lost between June 1, 1988 (the start of the Normal Operating Season [2] for Blacksmith) and June 25, 1988 (the original Blacksmith completion date) would commence seven days after the work at Boundary was completed, subject to certain contingencies not here relevant. By contract modification with letter of June 17, 1988 the contracting officer extended the termination date of the Blacksmith contract to August 12, 1988. By contract modification with letter of August 11, 1988 the contracting officer extended the termination date of the Blacksmith contract to August 11, 1989. The contracting officer wrote:

> If additional adjustments in termination date is requested after operations on fire damaged timber is completed, operating days available to you on the Blacksmith Timber Sale that may occur outside the normal operating period will be included in

determining a new contract termination date.

LDG points to this letter as confirming the Forest Service's promise of "day for day" credit for the days not worked at Blacksmith because of the Boundary operations, subject only to weather or road conditions (*i.e.*, available operating days) at Blacksmith.

LDG resumed operations at Blacksmith in June 1989, and on July 5, 1989 LDG requested further extension of the Blacksmith contract in accordance with these arrangements. On July 26, 1989 the contracting officer sent a contract modification to extend the Blacksmith termination date to November 30, 1989, but added the condition that the Blacksmith Normal Operating Season would be redefined as extended to November 30, 1989. Contracting Officer Moyle's letter of July 26 stated:

> The contract term is being extended to November 30, 1989 pursuant to B8.21 Contract Term Adjustment (CTA). The CTA is being offered to compensate for time you have spent logging fire damaged timber on the Sequoia National Forest Boundary Timber Sale through November 30, 1988. Boundary Timber Sale operations after that date are not being included in the CTA because Blacksmith Timber Sale was not operable during that period of time.

Section B8.21 Contract Term Adjustment provided:

> [In applicable circumstances] the contract term shall be adjusted in writing to include additional calendar days in one or more Normal Operating Seasons equal to the actual time lost. . . .

The Blacksmith contract set the Normal Operating Season for that area as from June 1 to October 15 of each calendar year. With specified exceptions, LDG was permitted by the Blacksmith contract to conduct timber operations outside the Normal Operating Season, if weather and ground conditions permitted.

2. The Normal Operating Season is that period during which a timber sale is expected to be operable based on weather and road conditions.

LDG promptly objected to the part of the July 26, 1989 letter that proposed enlargement of the Blacksmith Normal Operating Season to November 30, 1989, stating that such enlargement was not in LDG's interest since it foreclosed LDG from obtaining additional working days without consuming contract extension days; LDG requested extension of the contract to September 5, 1990, that is, into the ensuing Normal Operating Season. Contracting Officer Moyle then withdrew the proffered extension, and on August 1, 1989 presented a formal contract modification finally terminating the Blacksmith contract on October 15, 1989, with a letter wherein the contracting officer stated that he was "incorrect" when he wrote LDG a year earlier (on August 11, 1988) with the contract extension then provided, that additional days of extension would be available at Blacksmith based on Boundary activities outside of the Blacksmith Normal Operating Season. The contracting officer also advised LDG that LDG could "qualify for a contract term extension by cutting and removing at least 75% of the advertised sale volume" by October 15, 1989. LDG executed, under protest, the contract modification accompanying this letter.

LDG had cut 60–65% of the Blacksmith timber by October 15, 1989. The contracting officer refused further extension, and LDG appealed to the Department of Agriculture Board of Contract Appeals, seeking extension of the Blacksmith contract. The Board dismissed that appeal without prejudice, holding that it had no authority to grant the requested form of relief. LDG then filed a claim for damages, in the amount of the contract price of the uncut timber. The contracting officer denied the claim, and LDG appealed to the Board.

In the Board proceedings LDG's position was that it was wrongly denied extension as was needed to complete logging of the Blacksmith sale. LDG stated it had relied on the Forest Service's representations that it would extend the term of the Blacksmith sale, day for day, for the time spent on the Boundary sale both within and outside the Blacksmith Normal Operating Season. LDG also stated that the offer to extend the term

to November 30, 1989 was wrongfully withdrawn, referring to Contracting Officer Moyle's sudden action on August 1, 1989 wherein he set the final deadline of October 15, 1989, leaving insufficient time for LDG to log the remaining 5,245,000 board feet of the Blacksmith sale. LDG stated that the Forest Service was required to extend the contract in accordance with its representations, and that LDG was entitled to an extension into the following year's Normal Operating Season and commensurate damages.

In an initial ruling the Board held that the Forest Service was not bound by the representations accompanying the various contract modifications, holding that "[t]he CO's actions do not rise to the level of a formal contract modification." The Board held that the issue was controlled by the theory of equitable estoppel. After a subsequent hearing that was focussed on this theory, the Board held that LDG had failed to establish an essential element of equitable estoppel: detrimental reliance on the contracting officer's promises. The Board also held, as an alternative ground of denial of LDG's claim, that LDG had received more days of extension at Blacksmith than the total day-for-day credit it had earned for the days worked on the Boundary sale. Thus the Board held that LDG could not prevail even on its theory based on contract principles. This appeal followed.

## DISCUSSION

The Contract Disputes Act sets the standard of appellate review of decisions of the agency Board of Contract Appeals. The Board's findings of fact must be sustained unless they are arbitrary, capricious, or not supported by substantial evidence, while the Board's conclusions of law receive plenary review on appeal. 41 U.S.C. § 609(b).

### A

The government argued before the Board, and again in its briefs to this court, that Contracting Officer Moyle exceeded his authority in promising to include the days that LDG worked outside the Normal Operating Season, to extend the Blacksmith termination date. The government argued that

the burden was on LDG to prove that the contracting officer was acting within his authority, citing *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) and stating that "because clause B8.21 does not, by its terms, allow extensions for delays outside the NOS, the CO exceeded his authority under the terms of the contract to the extent he promised or authorized them."

■■■ The contracting officer is the official representative of the government in doing business with the public. *See* FAR 2.101, 48 C.F.R. § 2.101 (" 'Contracting Officer' means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings.") This carries with it the authority to modify contracts. *See Gene Peters v. United States*, 694 F.2d 687, 693 (Fed.Cir.1982) ("This delegation of authority to the Forest Service Chief to enter into such contracts [to sell timber] necessarily and inherently includes the authority to enter into modifications of them as well.") When the contracting officer administers a contract with which the officer is charged, the promises and representations made by the officer, when within the scope of the subject matter of the contract can not be avoided by simply disclaiming the contracting officer's authority when the contract reaches litigation.

■■ Although the private sector contracting party bears certain risks if federal agents act beyond their authority, see *Federal Crop Insurance*, the letters from Contracting Officer Moyle were within the scope of the contracts with LDG and the routine administration thereof. According to LDG, Contracting Officer Moyle testified before the Board that he "did not even know he was exceeding his authority." Attorney argument is insufficient to overcome the presumed regularity of an act of contract administration that is *prima facie* within the contracting officer's assignment. In contrast, in *Federal Crop Insurance* a publicly available regulation expressly prohibited the act of the government agent on which the private contractor had relied. No regulation prohibited the contracting officer from making the representations and modifications he

made, over a period of several years, administering these contracts without objection from the Forest Service.

■■ The several contract modifications were all concerned with the Blacksmith contract in accordance with the adjustments flowing from the fire at Boundary, all of which reflected the regulations and practices of the Forest Service. When the actions of the contracting officer are within the authority that pertains to the subject matter of the contract, and no statute or regulation limits that authority, as in *Federal Crop Insurance*, the agency bears the burden of coming forward with evidence of lack of authority for the actions of the contracting officer. This burden is not met simply by attorney allegation in a litigation context.

No statute, regulation, or rule was cited as violated by the contract extensions and representations of Contracting Officer Moyle, and indeed nothing in these routine arrangements reasonably suggested lack of authority. Thus it was not necessary for LDG to prove the elements of equitable estoppel, as the Board held, for the Forest Service was bound, on principles of contract, to the promise that days worked at Boundary outside of the normal operating period would be included in determining the Blacksmith termination date. The agency was obligated to grant LDG day for day credit for the days worked at Boundary, subject only to the condition that Blacksmith was not inoperable on those days. The denial of LDG's claim can not be sustained on the primary ground relied upon by the Board.

### B

As an alternative ground for denying LDG's claim, the Board found that LDG "received contract term adjustments totaling more days than the actual time lost removing fire-damaged timber from the Boundary sale." The Board found that 214 days were lost, accepting the position of the government's witnesses who testified that Blacksmith was not operable after November 30, 1988. Although this evidence was disputed by LDG, the finding turned on matters of

credibility and weight, and must be sustained.

The Board calculated that LDG received an actual credit of 249 days before the October 15, 1989 termination. For this count the Board included the 112 days in the 1988 Normal Operating Season (June 25–Oct. 15) for which extension was granted, and 137 days in the 1989 Season (from June 1, the beginning of the Season, until October 15) for which extension was granted. LDG has shown no error in the Board's calculations.

LDG argues that its day for day credits should have been applied to extend the Blacksmith contract into the succeeding (1990) Normal Operating Season. However, the Board's finding that full credit for the days lost does not reach into 1990 is supported by substantial evidence. Although we agree with LDG that the contracting officer's proposed extension of the Normal Operating Season to November 30, 1989 was contrary to the terms of the contract, see Section B8.21 quoted *supra*, LDG nonetheless received its full entitlement of earned extensions by the October 15, 1989 closure.

We conclude that the Forest Service met its commitment to provide full credit at Blacksmith for the days worked at Boundary. On this ground, the Board's decision is affirmed.

No costs.

*AFFIRMED.*