

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-8-1998

# Gardiner v. VI Water Power Auth

Precedential or Non-Precedential:

Docket 96-7565

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Gardiner v. VI Water Power Auth" (1998). *1998 Decisions.* Paper 136.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/136

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 8, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-7565

FITZROY GARDINER, d/b/a
WESTERN TRADING ENTERPRISES

v.

VIRGIN ISLANDS WATER & POWER AUTHORITY

VIRGIN ISLANDS WATER & POWER AUTHORITY,

    Third-Party Plaintiff

v.

THE FEDERAL EMERGENCY MANAGEMENT AGENCY;
THE ARMY CORP OF ENGINEERS;
THE UNITED STATES GEOLOGICAL SOCIETY

    Third-Party Defendants

    Virgin Islands Water &
    Power Authority,
    Appellant

On Appeal from the District Court of the Virgin Islands
Division of St. Croix
(D.C. Civil Action No. 90-cv-00295)

Argued April 8, 1997

Before: BECKER, ROTH and WEIS, Circuit Judges

(Opinion Filed June 8, 1998)

John K. Dema, Esq. (Argued)
Carey-Anne Moody, Esq.
Law Offices of John K. Dema
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5008
 Attorneys for Appellee

John J. Cooney, Esq. (Argued)
Venable, Baetjer, Howard & Civiletti
1201 New York Avenue, N.W.
Suite 1000
Washington, DC 20005

Barbara Twine-Thomas, Esq.
Virgin Islands Water & Power
 Authority
P.O. Box 1450
Charlotte Amalie, St. Thomas
U.S. Virgin Islands 00804
 Attorneys for Appellant

OPINION OF THE COURT

ROTH, Circuit Judge

When Hurricane Hugo hit the Virgin Islands on September 17 and 18, 1989, it destroyed the potable water delivery system on St. Croix. The Virgin Islands Water and Power Authority (WAPA),[1] and officials of the United States government immediately began efforts to restore water service, using fresh water wells. Because the equipment being used at each well site was in high demand on the island, FitzRoy Gardiner and his company, Western Trading Enterprises (Gardiner), were hired to perform security and maintenance service at the wells 24 hours a day. The bill for Gardiner's services over the following ten weeks came to $1,245,178, of which WAPA has paid $616,538. In this action Gardiner sought the balance from WAPA. WAPA

_____

1. WAPA has the statutory obligation to provide water for the residents of the Virgin Islands, V.I. Code Ann. tit. 30 S 105(a).

2

based its refusal to pay on its contention that it did not contract with Gardiner but that Gardiner contracted instead with the United States.

I. Factual Background

In the days following the hurricane, the United States and WAPA worked together to implement a water distribution system using about 45 fresh water wells located in well fields owned by WAPA. Each well required a pump and a generator to power it. From the wells, water was pumped into storage tanks and then into pressurized distribution lines. These too required pumps and generators. The Army Corps of Engineers, along with the Federal Emergency Management Agency (FEMA) and WAPA, obtained the necessary equipment, which was apparently owned, at least in part, by the federal government.

By early October the new system was in place, but security at the wells quickly became a serious problem despite a tightly-enforced curfew to prevent violence and looting. The lack of electric power on the Island made the generators very desirable; the wells themselves were located in remote areas, covered with dense vegetation up to six and a half feet high. WAPA employees provided security services during the first few days of October, until several employees were threatened by persons who were attempting to steal the generators and pumps. The United States Army, the National Guard, and the Virgin Islands Police Department refused to provide the necessary 24 hour security. WAPA acknowledges that providing the security was hazardous work.

Bruce Green, an employee of the United States Geological Survey assigned by FEMA to work on the Islands, and Romeo Cipriani, Superintendent of the Water Distribution System for WAPA on St. Croix, met with Gardiner in early October to discuss security at the well fields. Gardiner had previously worked for WAPA and was already doing work for WAPA on another project. Green and Cipriani reviewed the problems at the wells with Gardiner, and Gardiner orally agreed to provide both security and maintenance services 24 hours a day. According to Bruce Green's

3

deposition, Gardiner was told at this initial meeting that WAPA would be reimbursed by the federal government for the payments to Gardiner. Gardiner, on the other hand, testified that he did not learn this until later. There was no written contract. Gardiner began to perform the services immediately. He had people in the field within hours. By all accounts, Gardiner and his crews were resourceful and highly successful. In order to assure uninterrupted service, Gardiner constructed shelters for his crews at the wells. His crews kept the equipment fueled and performed maintenance services such as changing oil, adjusting carburetors, and repairing and replacing filters, mufflers, starter cords, and other parts. When three generators failed, Gardiner replaced them with his own.

On October 25, 1989, Gardiner, Cipriani, and Fred Rounsaville of the Army Corps of Engineers met to discuss Gardiner's fee for his services. Gardiner agreed to lower his rates from $30 to $22.50 per person per hour during the day and from $35 to $27.50 per hour at night.[2] In a memorandum discussing this negotiation, Rounsaville wrote that the "charges of $30 and $35 per hour" were "excessive and I requested a meeting with Mr. Cipriani of WAPA, the contractor and Mr. Green." Rounsaville also wrote that he thought the new rates were still too high but that "I agreed to the hourly rates" because of the "importance of providing drinking water to the residence [sic]." Gardiner, according to the memo, threatened to withdraw all workers by nightfall if his terms were not met. Finally, Rounsaville's memo states that "I discussed this with John Swanson and he agreed with my conclusion even though the rates were higher than usual the need outweighed the costs."

The United States was still unhappy with Gardiner's fees, however, and on November 2, 1989, Rounsaville and

_____

2. These figures are taken from the district court's opinion at page 6. The court's findings of fact and conclusions of law, which followed the bench trial on damages, reflect that the billing was actually somewhat more complicated. Findings of Fact and Conclusions of Law at PP 17-22. The billing rates and amount of damages are not at issue on this appeal except that WAPA has challenged the award (but not the amount) of prejudgment interest.

4

Gardiner agreed to lower the rates to $20 per hour during the day and $25 per hour at night, beginning with the sixth week of service. WAPA maintains that none of its employees participated in this meeting.

As discussed by Green, Cipriani, and Gardiner at their initial meeting, Gardiner submitted his invoices to WAPA. On November 2, 1989, WAPA paid the invoices, which totaled $282,275 for the weeks ending October 7 and 14. Gardiner received payment for the last two weeks of October, more than $334,000, on approximately November 7. The checks to Gardiner were signed by Nellon Bowry, chief financial officer of WAPA, and Alberto Bruno-Vega, Executive Director of WAPA.

On November 21, 1989 the WAPA Governing Board passed a resolution that, according to Bruno-Vega's deposition testimony, ratified his expenditures in excess of $75,000 in the immediate wake of the hurricane. The resolution provided in part:

> WHEREAS, in an informal emergency meeting of the Governing Board, and in other meetings of the Governing Board's Finance Committee, since Hurricane Hugo, the Governing Board informally granted the Executive Director the authority to temporarily negotiate, sign and execute contracts and other transactions of the Authority for amounts in excess of $75,000, without prior consent of the Governing Board; therefore,
> BE IT RESOLVED BY THE GOVERNING BOARD: that the Executive Director of the Authority, Alberto Bruno-Vega, be authorized to negotiate, sign and execute contracts and other necessary transactions of the Authority for amounts in excess of $75,000, without prior consent and knowledge of the Governing Board, during the Authority's emergency efforts to restore service and to repair its facilities from the damage caused by Hurricane Hugo. Said authorization shall terminate upon the entry of a resolution of the Governing Board expressly terminating said temporary authorization.

After paying Gardiner for the last two weeks of October, WAPA refused to make any further payments. WAPA paid

5

Gardiner $616,538 in total, covering the first four weeks of services. Gardiner billed WAPA a total of $1,245,178 for the ten weeks of services. Gardiner testified that he was shown a check in the middle of November that had been made out to him by a WAPA employee, but that he was told there was a problem and it would not be delivered immediately. WAPA did not, however, tell Gardiner to stop protecting the wells or to seek payment from the federal government. Gardiner continued to provide services through the middle of December. Beginning in November, WAPA charged its customers for the water supplied by the well fields.

Under the system set up for Gardiner's payments, WAPA paid Gardiner and then sought reimbursement from the United States. WAPA claims that it stopped paying Gardiner when it realized that FEMA might not reimburse it for Gardiner's services. WAPA has stipulated that each time it requested reimbursement for expenses, it had tofile a "form No. 270," which stated, in part that "FEMA is not a party to this contract." Damage Survey Reports ("DSR"), which accompany requests for assistance after a natural disaster, were compiled by Fred Rounsaville and submitted to FEMA. Although Rounsaville approved Gardiner's rates and told WAPA officials that senior FEMA officials approved them as well, FEMA initially authorized payment of $830,000 to WAPA, more than $400,000 less than Gardiner was owed. This figure was further reduced by the Inspector General's review of the billing after Gardiner had finished the work. After this audit, FEMA agreed to reimburse WAPA a total of only $443,000.

II. Procedural Background

Gardiner filed suit against WAPA in November, 1990, in the District Court of the Virgin Islands. The complaint alleges that WAPA breached a contract with Gardiner when it refused to pay for Gardiner's services.

On January 25, 1991, WAPA filed a third party complaint against FEMA, the Army Corps of Engineers and the United States Geological Society. The third party defendants, along with Gardiner, moved to dismiss. The court granted the motion on April 17, 1991, in a two page order, which read in part:

> The third party plaintiff having conceded that the jurisdiction of the third party claim belongs with the United States Claims Court; and
> It appearing that the United States Claims Court does not have jurisdiction over the plaintiff's claim against the Virgin Islands Water and Power Authority as that court does not have jurisdiction over suits between private parties [citation omitted]...IT IS...ORDERED that the motion of the third party defendants is granted....

On July 12, 1991, WAPA moved to "Amend and/or Reinstate a Third-Party Complaint and a Cross Claim Against the United States of America and to Transfer Entire Matter to the United States Claims Court." WAPA argued in support of the second motion that under 28 U.S.C. S 1631, the district court could transfer the case to the Court of Claims after joining the United States as a party.

The district court granted WAPA's motion to amend and/or reinstate its third party complaint on June 30, 1992. The district court reasoned that the transfer was appropriate pursuant to 28 U.S.C. S 1406(c). Gardiner appealed. The Court of Appeals for the Federal Circuit reversed and remanded on September 2, 1993. The Court of Appeals determined, in part, that "the district court relied on 28 U.S.C. S 1406(c) as it existed prior to 1982 in transferring this case to the claims court," that this statute "was repealed by Congress in 1982," and no longer provided the court with authority to transfer the case. The Court of Appeals also noted that WAPA did not allege in its pleadings that it had a contract with the United States and that WAPA therefore did not state "a claim upon which relief may be granted by the claims court."

On September 10, 1993, WAPA renewed its earlier motion, dated May 10, 1991, to dismiss for failure to join an indispensable party, the United States. The district court heard argument on the motion on December 20, 1993, and denied it "for the reasons stated on the record." The court stated that "[t]his is a case we've struggled with and struggled with, and based on law and a growing equity of claims of injustice [sic] compelled and must be denied." The court also said that it would let WAPA use "the

7

evidence of FEMA assurances" and the evidence of an agreement between the plaintiff and the United States "to disprove the plaintiff 's claim of a contract between it and WAPA." WAPA filed a notice of appeal on January 19, 1994. The appeal was dismissed for lack of jurisdiction on November 18, 1994.

The district court granted a motion by Gardiner for partial summary judgment on August 17, 1995. The court held that Gardiner and WAPA had a binding contract, but reserved the issue of damages for trial. After a bench trial on January 23 and 24, 1996, the court issued findings of fact and conclusions of law on August 14, 1996. The court found that WAPA owed Gardiner $628,640 for unpaid services performed by Gardiner under the contract and that WAPA was liable for prejudgment interest in the amount of $377,184. The interest represented 9% simple interest per annum from December 9, 1989, to August 8, 1996. The court entered judgment for Gardiner in the amount of $1,005,824. The court also awarded Gardiner attorney's fees and set a briefing schedule to determine the amount. WAPA appealed to this Court on September 12, 1996.

The district court had jurisdiction of this case under 48 U.S.C. S 1612. We have appellate jurisdiction under 28 U.S.C. S 1291.

III. Motion to Dismiss for Lack of an Indispensable Party

WAPA argues that under Federal Rule of Civil Procedure 19(b) the district court should have dismissed this case because the United States is an indispensable party which cannot be joined. WAPA maintains that because the United States was not a party, WAPA was not able to demonstrate that Gardiner contracted with the United States instead of with WAPA. WAPA bases this claim in part on the fact that it had only limited discovery against the United States. WAPA also contends that this action will impact the United States because the decision will resolve some of the terms of the contract, such as the amount that Gardiner is entitled to recover. Finally, WAPA claims that failure to include the United States as a party forces WAPA to assume the risk of inconsistent obligations.

8

In determining whether a district court should have dismissed a case under Rule 19(b) for failure to join an indispensable party, we must make a preliminary determination that the non-joined party cannot be joined under Rule 19(a). Only if a party cannot be joined under Rule 19(a), does Rule 19(b) come into play.3 Shetter v.

_____

3. Federal Rule of Civil Procedure 19 provides in part that:

> (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if
>
> (1) in the person's absence complete relief cannot be accorded among those already parties, or
>
> (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may
>
> (I) as a practical matter impair or imped the person's ability to protect that interest or
>
> (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.
>
> If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.
>
> (b) Determination by the Court Whenever Joinder Not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second,

the extent to which, by protective provisions in the judgment, by the

shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an

adequate remedy if the action is dismissed for nonjoinder.

(emphasis added).

9

Amerada Hess Corporation, 14 F.3d 934, 941 (3d Cir. 1993); Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 404 (3d Cir. 1993).

We exercise plenary reviews over a Rule 19(a) determination to the extent that it is based on conclusions of law; as to subsidiary findings of fact we apply a clear error standard. HB General Corp. v. Manchester Partners, L.P., 95 F.3d 1185, 1189 (3d Cir. 1996) (citing Janney, 11 F.3d at 404). Rule 19(b) determinations are reviewed for an abuse of discretion. HB General Corp., 95 F.3d at 1189.

Even assuming that the United States could not have been joined under Rule 19(a), we cannot conclude that the district court abused its discretion in refusing to dismiss under Rule 19(b). See Schulman v. J.P. Morgan Inv. Management, Inc., 35 F.3d 799, 806 (3d Cir. 1994). Under Rule 19(b), the district court had to decide whether the United States's participation in the litigation was so important that "in equity and good conscience the action...should be dismissed, the absent person being thus regarded as indispensable." The four factors listed in the Rule are not exhaustive, but they are the most important considerations in deciding whether to dismiss the action. Wright, Miller & Kane, Federal Practice and Procedure S 1608 at 91 (2d Ed. 1986).

The first and second factors under Rule 19(b) are "to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties," and to what extent such prejudice can be avoided. Here, there is little danger of prejudice to the absent party -- the United States -- if this case goes forward without it. Indeed, the United States does not want to become a party to the suit, strongly suggesting that its interests will not be impeded if the suit goes forward without it. See Sindia Expedition v. Wrecked & Abandoned Vessel, 895 F.2d 116, 121 (3d Cir. 1990) (reasoning that Rule 19(a)(2)(I) did not apply because New Jersey was "manifestly unconcerned with any adjudication in its absence");[4] see also Peregrine

---

4. The first factor under Rule 19(b) overlaps considerably with the Rule 19(a) analysis. Wright, Miller & Kane, Federal Practice and Procedure S 1608 at 91.

10

Myanmar Ltd. v. Segal, 89 F.3d 41, 49 (2d Cir. 1996). Moreover, there is no prejudice to Gardiner in excluding the United States. Gardiner can recover fully from WAPA, the party with whom Gardiner claims it has a contract.

WAPA, on the other hand, argues that the absence of the United States has seriously hampered WAPA's effort to show that there was no contract between WAPA and Gardiner. WAPA has not, however, come forward with much to support this claim. Indeed, as Gardiner points out, WAPA deposed a number of federal officials: Fred Rounsaville, Edward Orchowski, Steve Singer, Thomas Barbee, Adair Martin, David Shriver, Wynn Fuller, Colonel Cox, and Gerald Connolly. Despite the depositions, WAPA claims that it was unable to obtain relevant "internal documents" from the government, but WAPA has not presented specific evidence of prejudice. Although we do not suggest that WAPA must identify beforehand the contents of the documents that it seeks, WAPA must nonetheless identify with greater specificity the information that it needs. For example, WAPA might, argue that it could not show which federal officials had the implied authority to contract with Gardiner because it was not given information about their jobs and responsibilities. Or WAPA might assert that it could not learn who the contracting officers on St. Croix were immediately after Hugo hit. WAPA has not, however, made any such contention. Given the extensive discovery permitted in this case, WAPA should be able to identify any missing information with more detail than the phrase "internal documents."

WAPA also argues that it "runs the risk of inconsistent adjudication of its rights" if the United States is not joined because, if Gardiner prevails, WAPA must then pursue a remedy against the United States in a different action. The risk of inconsistent judgments, although mentioned specifically in Rule 19(a)(2)(ii), is relevant under Rule 19(b) as well. Schulman, 35 F.3d at 806. In general, however, "a defendant's right to contribution or indemnity from an absent non-diverse party does not render that absentee indispensable pursuant to Rule 19." Janney, 11 F.3d at 412. In Janney, we considered an agreement in which Janney would serve as an advisor to Underwood and its

11

subsidiary, Shepard Niles. Janney sued Shepard Niles, and Shepard Niles contended that Underwood, as a co-obligor to the contract, was a party to be joined if feasible under Rule 19(a). If joined, Underwood would have destroyed diversity jurisdiction.

We concluded that the outcome of the case would be"res judicata or collateral estoppel as between Janney and Shepard Niles," but that Janney "remain[ed] free to claim contribution or indemnity from Underwood." We went on the explain that "a defendant's right to contribution or indemnity from an absent non-diverse party does not render that absentee indispensable pursuant to Rule 19." 11 F.3d at 412 (quoting Bank of America National Trust and Savings Association, 844 F.2d 150, 1054 (3d Cir. 1988)). A defendant may implead the absent party under Federal Rule of Civil Procedure 14, but is not required to do so, "and if it does not, its right to bring a separate action for contribution or indemnity is unaffected." Id.5

In this case, unlike Janney, the defendant does not have the option to implead the absent party because we lack jurisdiction over the United States. Indeed, the third-party complaint which WAPA filed against FEMA, the Army Corps of Engineers, and the United States Geological Society, was dismissed for lack of jurisdiction. But the reasoning of Janney -- if a defendant does not implead an absent party, there is no legal effect on its rights of contribution or indemnification -- applies with equal force here.6 WAPA is free to pursue any claim it has against the United States in

_____

5. Some courts, and Wright, Miller & Kane, reason that joint obligors to a contract "are treated as Rule 19(a) parties, but are not deemed indispensable under Rule 19(b). Wright, Miller & Kane, Federal Practice & Procedure S 1613 at 182-183."

6. WAPA suggests that the terms of a contract between it and the United States could be determined in the litigation between WAPA and Gardiner. Specifically, WAPA points to the issue of what rates Gardiner was entitled to receive. It is not clear, however, how the determination of the rates in a contract between Gardiner and WAPA necessarily resolves the issue of the reimbursement which the United States may have agreed to pay WAPA. WAPA, for example, may have agreed to pay Gardiner's high rates, while the United States may have contracted with WAPA to reimburse standard or reasonable rates. We express no opinion on these issues and raise them only to note the problems in WAPA's claim. Contrary to WAPA's claim, this litigation will only bind the parties involved and those in privity with them; this does not appear to include the United States. 18 Moore's Federal Practice, S 132.01[1] (Matthew Bender 3d ed.)

a separate action. We recognize that this is a less convenient remedy for WAPA. Nevertheless, it is a means of resolving WAPA's claim of the risk of inconsistent obligations.

WAPA's final argument on the issue of prejudice is that the district court did not permit it to present its defense that Gardiner contracted not with WAPA, but with the United States. In support, WAPA points to the district court's statements that the involvement of the United States was not "material" or "pertinent." These statements reflect, however, the district court's conclusion that Gardiner had demonstrated that Gardiner and WAPA had a contract, making summary judgment appropriate. If the district court determined that a contract existed between WAPA and Gardiner, Gardiner was entitled to summary judgment, regardless of what agreement WAPA may have had with the United States. We will consider the district court's grant of summary judgment in the next section. We note only that whatever "prejudice" may have enured from the district court's conclusions on materiality and pertinence goes only to the issue of the propriety of summary judgment. The district court's statement that certain activities by federal officials were not"material" to its determination that Gardiner's contract was with WAPA was made in the context of the consideration of summary judgment and it has no bearing on whether joinder of the United States was feasible under Rule 19(b).

The third factor under Rule 19(b) is "whether a judgment rendered in the person's absence will be adequate." This element allows the court to consider whether the relief it may grant will be an adequate remedy for the plaintiff. Provident Bank & Trust Co. v. Patterson, 390 U.S. 102, 112 (1968). Wright, Miller & Kane, Federal Practice & Procedure S 1608 at 116. This factor weighs, in our view, in favor of WAPA. WAPA's claim, as construed by the district court, will be resolved in one action. Moreover, as we note above, the possibility that the defendant may have a claim for contribution or indemnity does not render an absentee indispensable. The right to contribution and indemnity should not, therefore, be considered to cause inadequacy of the resulting judgment.

13

The fourth Rule 19(b) factor, whether the plaintiff has a remedy if the action is dismissed, counsels strongly against dismissal in this case. WAPA argues that "Gardiner could have filed the same action in the Court of Federal Claims, where all parties could be joined in one action, for a conclusive and mutually consistent resolution of their rights and responsibilities." The problem with this argument, however, is that Gardiner does not allege that he had a contract of any sort with the United States. Gardiner has not alleged a cause of action against the United States; thus, he does not have a remedy in the Court of Claims. Unless Gardiner claims a contractual relationship with the United States, the Court of Claims simply has no jurisdiction over the case. The Court of Appeals for the Federal Circuit reversed Judge Brotman's transfer of the case to the Court of Claims for exactly this reason-- that court had no jurisdiction over a dispute between WAPA and Gardiner. Decision of the Court of Appeals for the Federal Circuit, September 2, 1993; Appendix at 2167, 2171-2172. WAPA's argument that Gardiner should file in the Court of Claims implies that Gardiner has to rewrite his claim to assert that his contract was with the United States. Such a revision would, however, provide no remedy for the claim that Gardiner makes against WAPA for breach of contract.

With these considerations in mind, we conclude that the district court did not abuse its discretion in denying the Rule 19(b) motion. Gardiner would have had to have alleged an entirely new cause of action against the United States in order to bring this suit in the Court of Claims. Indeed, Gardiner would have had to have alleged something that it maintains did not exist -- a contract with the United States. Moreover, WAPA's claim of prejudice in discovery matters, as we have seen, adds little. For these reasons, it was well within the discretion of the district court to deny WAPA's motion.

IV. Summary Judgment

In granting summary judgment for Gardiner, the district court reasoned that neither Cipriani for WAPA nor Green for FEMA had the authority to enter into a contract on behalf of the parties that they represented. The district

14

court concluded, however, that the actions of Cipriani were later ratified by Bruno-Vega and the WAPA Board, resulting in an enforceable contract. On the other hand, the court reasoned that there "is simply no evidence of ratification of the agreement by any other individual who could have ratified a contract entered into by Mr. Green." The court accordingly granted summary judgment on the issue of liability in favor of Gardiner and against WAPA. We exercise plenary review. Public Interest Research of N.J. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 71 (3d Cir. 1991).

WAPA make three basic arguments that summary judgment for Gardiner was error. First, it points to evidence that FEMA officials ratified Green's actions and made binding the alleged contract between Green and Gardiner. Second, WAPA argues that in this emergency situation where the United States played a large role in negotiating and overseeing the contract, WAPA can recover if it proves an implied-in-fact contract, even if no "contracting officer" with specific authority to bind the United States approved the contract. Finally, WAPA maintains that, even if it had a contract with Gardiner, there is evidence that the contract included a term that Gardiner would only be paid to the extent that WAPA was reimbursed by the government, precluding summary judgment for Gardiner.

The government enters into contracts with the public through "contracting officers." LDG Timber Enterprises, Inc. v. Glickman, 114 F.3d 1140, 1143 (Fed. Cir. 1997). The Federal Acquisition Regulation ("FAR") defines a contracting officer as "a person with the authority to enter into, administer and/or terminate contracts and make related determinations and findings." 48 CFR S 2.101 (1996). The regulations also provide that "[c]ontracts may be entered into and signed on behalf of the Government only by contracting officers," 48 CFR S 1.601(a), and that "[c]ontracting officers may bind the Government only to the extent of the authority delegated to them." 48 CFR S 1.602-1(a). Part 4401 of FAR "sets forth policies and procedures concerning the Federal Emergency Management Agency Acquisition Regulation (FEMAAR) System." 48 CFR S 4401.000. This part states the qualifications required for contracting officers within FEMA and explains that except

15

for "disaster-related activities and unusual circumstances as determined by the head of the contracting activity, it is policy to delegate contracting officer authority to individuals rather than positions." 48 CFR SS 4401.603-2(a) and 4401.603-3.

As the discussion above makes clear, only those with specific authority can bind the government contractually; even those persons may do so only to the extent that their authority permits. Moreover, a party who seeks to contract with the government bears the burden of making sure that the person who purportedly represents the government actually has that authority:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his power.

Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947).

This allocation of risk, the Court reasoned, "does not reflect a callous outlook," but instead "merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury," whether those conditions appear in the statutes themselves or are part of regulations that implement those statutes. Id. at 384-385. Other policy grounds supporting this rule were stated more recently by the Federal Circuit: "The United States Government employs over 3 million civilian employees. Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obliging the United States." City of El Centro v. U.S., 922 F.2d 816, 820 (Fed. Cir. 1990).

In this case, Gardiner claims that WAPA's defense that Gardiner actually had a contract with the United States, not WAPA, is defeated by WAPA's failure to identify a contracting officer who could have bound the United States.

16

We agree. It is undisputed that Bruce Green had no such authority; neither did Gerald Connolly, the federal coordinating officer for the Virgin Islands disaster, or Steven Singer, the deputy federal coordinating officer for St. Croix. WAPA argues that it has presented evidence of ratification of the contract by "senior officials in the FEMA disaster relief effort," namely Connolly and John Swanson. WAPA has pointed to absolutely no evidence that Swanson had the authority to contract on behalf of the government. The record is clear that Connolly did not. Although WAPA contends it has been unable to get information that it needs from the United States during the course of this litigation, it deposed at least five FEMA officials and has pointed to no unanswered question as to who the contracting officers were in FEMA or on St. Croix. Because there is no evidence to support WAPA's claim that the contract was ratified by someone in the federal government who had the authority to do so, summary judgment was appropriate unless, as WAPA also argues, the approval of a contracting officer was not necessary.

WAPA maintains that no contracting officer needed to approve the agreement for the United States because this case comes within a "branch of the implied-in-fact contract doctrine that applies specifically in emergency situations." To prove an implied-in-fact contract, the party alleging that contract must show the same elements required in an express contract: offer, acceptance, and consideration. See Trauma Services Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). Proof of an implied-in-fact contract comes not from an express agreement, however, but from "conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Id. (quoting Hercules, Inc. v. United States, 116 S.Ct. 981, 985 (1996) (quoting Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923))). Significantly, an implied-in-fact contract, like an express contract, must include authorization (whether implied or express) by an agent with the authority to bind the United States. Trauma Services, 104 F.3d at 1326; City of El Centro, 922 F.2d at 820.

WAPA argues that the required authorization can be implied from the high-ranking officials who tacitly approved

the contract and that because this was an emergency situation a contracting officer was not required to bind the United States. There is, as WAPA maintains, evidence that federal officials played a major part in negotiating and overseeing Gardiner's contract to provide security and maintenance services. This evidence also indicates that the federal government may have benefitted from the security services because of its ownership of the generators. Federal officials also negotiated fee reductions on at least two occasions; in one instance WAPA claims that none of its officials were even present. WAPA sought and obtained assurance from Rounsaville that the rates were acceptable to FEMA officials. Apparently, Rounsaville also cleared the rates with John Swanson and Gerald Connolly, FEMA's coordinating officer in the Virgin Islands. The Hurricane Hugo emergency required, at least initially, quick action by WAPA and federal officials.

We cannot agree with WAPA, however, that this evidence creates a genuine issue of material fact as to whether the actions of the senior FEMA officials bound the United States in a contract with Gardiner. The possibility that the contract was implied-in-fact does not dispense with the requirement that those whose course of conduct show contractual intent have the actual authority to bind the government. Trauma Services, 104 F.3d at 1326. "Senior" officials may or may not have contracting authority; WAPA has come forward with nothing suggesting that those involved with the procurement of Gardiner's services did. See City of El Centro, 922 F.2d at 821 (placing burden of showing that government agent had requisite contracting authority with the party seeking to show an implied-in-fact contract with the government).7

_____

7. In some situations authority to bind the government can be implied "when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee." H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989) (quoting J. Cibinic & R. Nash, Formation of Government Contracts 43 (1982)). WAPA has not advanced this argument however, and has accordingly not pointed to evidence specifically suggesting that the authority to bind the government was "necessary or essential" to the duties of the federal officials involved. Roy v. United States, 38 Fed. Cl. 184, 188 (1997). It seems that to the extent

18

Neither does the urgency of the situation suggest a
different outcome. WAPA relies on Halvorson v. United
States, 126 F. Supp. 898 (E.D. Wash. 1954), in which the
court concluded that under the emergency conditions
created by a blizzard, the United States was responsible for
the costs incurred when federal officials directed
contractors to remove snow from the interior of a buildings
that was under construction. The contractors had made
clear that the building should not include uncovered
ventilation slots, but the Corps of Engineers insisted that it
should. As the contractors predicted, snow blew into the
interior of the unfinished buildings, threatening to do
substantial damage if it melted. The local job inspector, and
his immediate supervisor, directed the contractors to
remove the snow, which significantly reduced damages. The
Corps of Engineers refused to pay for the removal. The
court reasoned that:

> Whether or not the Resident Inspector, Mr. Jackson,
> and his supervisor, the Resident Engineer, had
> authority to bind the government by express contract,
> or to modify the written contract by oral agreement,
> they did, in the emergency situation created by the

_____

such authority was an integral part of the duties assigned to the first
officials that arrived on the Island, it would not extend to a contract
for
services lasting ten weeks. Moreover, application of this doctrine is
based
on "the existence of some express actual authority." Id. at 189, n.18.
Thus in Landau, the Federal Circuit concluded that two federal officials
who had the authority to co-sign for withdrawals from a joint bank
account that provided advance financing to government contractor, may
have had the implied authority to bind the government. A supplier to the
contractor sought letters from the federal officials -- who were not
contracting officers -- guaranteeing payment from the joint bank
account. The officials provided two such letters, the contractor did not
pay, and the government argued that its guarantee was invalid because
the officials lacked authority to bind it. The court concluded that the
explicit authority to draw checks on the account, considered with the
responsibility of finding suppliers, "may have carried with it the
implicit
authority to assure suppliers that they would be paid for providing the
materials." 886 F.2d at 324. Here, WAPA has pointed to no official who
had express actual authority, of any sort, from which further authority
could be implied.

> damage done by the blizzard, have authority to direct
> the contractors to proceed at once to minimize the
> damage by immediate remedial action.

126 F. Supp. at 900.

Whatever the continuing vitality of this doctrine, it is inapposite here. First, in Halvorson the government and the plaintiffs had already entered into a contract with each other, duly authorized by a contracting officer of the United States. Payment for the snow removal would fall either to the government -- the party who was benefited by the removal and whose negligence created the problem in the first place -- or to the contractor had who recommended constructing the building so as to avoid the problem.

In this case, the existence of a contractual relationship between Gardiner and the United States is itself at issue. Standard Form 270, provided by the government of the Virgin Islands for use in requesting reimbursements from the United States, explains that

> FEMA is not a party to this contract. Disputes arising
> between the parties to the contract will be resolved
> between the contractual parties by such means are
> available under the contract. Payment to the
> CONTRACTOR will not be contingent upon FEMA
> reimbursement

Thus, it appears that FEMA believed that there was no contract between it and Gardiner and that WAPA and Gardiner should sort out between themselves any disputes over payment. Moreover, even if the government benefited from Gardiner's services because it owned the generators, WAPA's benefit was at least as substantial because Gardiner enabled WAPA to restore drinking water, and ultimately to charge its customers for that water.

Moreover, despite the devastation created by Hurricane Hugo and the urgent need to supply a fresh water to the island, the policy implicit in Halvorson does not apply here. In Halvorson, the contractor's efforts were directed at removing snow as quickly as possible before a thaw melted the snow and destroyed the interior of the building. To this end it used "all of [its] men on the job and all of the men

20

they could employ in Havre," and even so some of the snow melted before it was removed. 126 F. Supp. 900. In this case, on the other hand, Gardiner provided emergency services for ten weeks, the provision of those services ultimately involved the highest level officials in WAPA, and the emergency brought federal officials with contracting powers to the Virgin Islands, although WAPA has presented no evidence that these officials were involved in this contract. If this case concerned only emergency services provided in the first hours or days after the hurricane, we would consider this claim in a different light, particularly in view of WAPA's evidence of significant involvement of federal officials in all aspects of procuring Gardiner's services. But the federal government reimbursed WAPA in the amount of $443,000, which paid for more than thefirst two weeks of services by Gardiner. WAPA had ten weeks during which it could have made sure that a contracting officer approved any contract between Gardiner and the United States or it could have asked Gardiner to discontinue his services. WAPA did neither.

Finally, WAPA argues that summary judgment was inappropriate because "the Gardiner contract, whomever it was with, contained a term that payment would be made only in amounts FEMA found were reimbursable." Gardiner asserts that this issue was not raised in the district court and should not be considered on appeal. WAPA responded, in its reply brief, that the "evidentiary submission on this point in district court refutes Gardiner's contention that this issue is being raised for the first time on appeal." At oral argument, WAPA maintained that this issue had been raised to the district court through WAPA's disputed findings of fact, particular disputed fact number eight, submitted in opposition to Gardiner's motion for summary judgment. This factual submission presents evidence that Gardiner knew the government thought his rates were too high and that the government negotiated with Gardiner to reduce his charges. It does not, however, show that there was a contract term that Gardiner would be paid only those amounts that FEMA found to be reasonable.

As a "general rule" we do not review "issues raised for the first time at the appellate level." United Parcel Serv. v.

21

Intern. Broth. Local No. 430, 55 F.3d 138, 140 n. 5 (3d Cir. 1995). Although we have the discretion to review an argument not raised below, we will ordinarily refuse to do so. Id.; see also Singleton v. Wulff, 428 U.S. 106, 120-121 (1976). WAPA's argument that "evidentiary submissions" supporting its new claim preserved the issue on appeal is essentially a claim that new arguments should be considered on appeal, as long as the evidence supporting them was submitted to the district court. In United Parcel, however, UPS failed to raise a legal theory -- that a clause of the contract violated public policy -- and we refused to consider that theory on appeal, although the evidence in support of the theory was presented to the district court. We considered a new legal theory for the first time on appeal in Salvation Army v. N.J. Dept. of Community Affairs, 919 F.2d 183, 196 (3d Cir. 1990), but only because the case law on the subject had changed.

WAPA has not persuaded us that this is a case in which we should disregard our general rule and consider on appeal a new argument in opposition to summary judgment. Nothing unusual, like an intervening change in the law or the lack of representation by an attorney, prevented WAPA from raising this issue below. This claim, moreover, contradicts WAPA's main argument -- that it had no contract with Gardiner. WAPA may have decided not to take such a position in the district court for fear that it would undermine WAPA's central claim. Under these circumstances, in the interest of fairness to the district court and to the plaintiff, not to mention the conservation of judicial resources, we will not consider this claim.[8]

_____

8. We will also affirm the award of pre-judgment interest. WAPA has argued in opposition to this award that pre-judgment interest cannot be awarded against the United States or against a party, like WAPA, that has a right to seek indemnity from the United States. Although the principle of sovereign immunity bars the collection of pre-judgment interest against the United States, courts have not extended the United States' sovereign immunity to a private party, even when the private party has an explicit indemnity agreement with the United States. See, e.g., Rochester Methodist Hospital v. Travelers Insurance Co., 728 F.2d 1006, 1012-13 (8th Cir. 1984). In reaching this conclusion, the Rochester court reasoned that sovereign immunity bars recovery only

V. Conclusion

For the reasons stated above, we will affirm the district
court's denial of WAPA's Rule 19(b) motion and we will also
affirm the judgment in favor of Gardiner.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

when the suit is in fact a suit against the United States; in a suit for
damages against a government agent, it is the agent who is liable even
if the agent then turns to the United States for reimbursement. The
present case is in fact an easier one because WAPA does not have an
explicit indemnity agreement with the federal authorities. For this
reason, a verdict against WAPA does not indirectly constitute a
determination of liability against the United States.

WAPA further contends that it would be inequitable to award pre-
judgment interest against WAPA because the non-payment to Gardiner
was a result of FEMA's failure to pay WAPA after FEMA had assured
WAPA that its payments to Gardiner would be reimbursed. This
contention is merely a recharacterization of WAPA's argument that
reimbursement by FEMA was a precondition to its duty to pay Gardiner.
Since we have upheld the district court's entry of summary judgment for
Gardiner, it follows that the award of pre-judgment interest is equitable.
The district court has determined that WAPA's duty to pay on the
contract was independent of any reimbursement agreement between
WAPA and the US government. Whether it is equitable to award pre-
judgment interest to Gardiner relates to the relationship between
Gardiner and WAPA, and WAPA failed to pay on the contract when
payment was due.

23