# In the United States Court of Federal Claims

No. 12-326C

(Filed: August 27, 2013)

```
**********************************
                                 )    Claim of breach of a contract entered
COUNCIL FOR TRIBAL               )    under the Indian Self-Determination and
EMPLOYMENT RIGHTS,               )    Education Assistance Act of 1975, 25
                                 )    U.S.C. §§ 450-458ddd-2; applicability of
            Plaintiff,           )    the Indian Employment, Training and
                                 )    Related Services Demonstration Act of
      v.                         )    1992; 25 U.S.C. §§ 3401-3417; Contract
                                 )    Disputes Act, now codified as 41 U.S.C.
UNITED STATES,                   )    §§ 7101-7109; contracting officer's
                                 )    authority; third-party beneficiary rights;
            Defendant.           )    recovery in *quantum meruit*
                                 )
**********************************
```

Daniel S. Press, VanNess Feldman, LLP, Washington, D.C. for plaintiff. With him on the briefs was Sean P. Jamieson, VanNess Feldman, LLP, Washington, D.C.

Joseph E. Ashman, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Donald F. Kinner, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Charles Wallace and William B. Blake, Branch of Acquisitions and Intellectual Property, Solicitor's Office – Division of General Law, United States Department of the Interior, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

Council for Tribal Employment Rights ("Council"), a national intertribal nonprofit organization which represents the employment interests of certain Indian tribes, seeks $500,000 in damages for the alleged breach of two agreements which involved the Council, the Office of Indian Energy and Economic Development ("the Office"), a component of the Bureau of Indian Affairs ("the Bureau"), U.S. Department of the Interior, and the Spirit Lake Tribe ("Spirit Lake" or "the Tribe"), a federally recognized Indian tribe. Both agreements were executed as

---

[1]A protective order was entered in this case to shield from disclosure records subject to the Privacy Act, 5 U.S.C. § 552a. Nothing in this opinion and order sets out information subject to that Act, and consequently the decision is being issued publicly as an initial matter.

amendments to an existing contract between the Office and Spirit Lake. The first, Amendment 2, involved the provision of funds to support a Native Construction Careers Initiative ("NCCI") commercial construction training program, and called upon the Council to conduct the training program. The second, Amendment 6, allocated funds to support training projects approved by the Federal Highway Administration ("FHWA"). The statement of work for that Amendment referenced an FHWA training program agreement which contemplated that the Council would provide training to develop certain certification programs for road construction activities.

Several years after the execution of Amendments 2 and 6, the Council submitted to the Office a certified claim for $200,000 for an alleged breach of contract relating to Amendment 2, as well as a certified claim for $300,000 for an alleged breach of contract arising from Amendment 6. *See* Compl. ¶ 5; Pl.'s Resp. to Order of Aug. 15, 2013, Attach. A (Certified Claim (Feb. 21, 2012)), Attach. B (Certified Claim (Mar. 13, 2012)), ECF No. 62.[2] The Office did not respond to Council's claims. *See* Def.'s Mot. to Dismiss, or in the Alternative, Mot. for Summary Judgment ("Def.'s Mot.") at 10, ECF No. 25. The Council then filed a complaint in this court on May 23, 2012. The government filed a motion to dismiss, or in the alternative, motion for summary judgment on December 11, 2012, and Council filed a motion for partial summary judgment as to its third-party beneficiary status in relation to Amendments 2 and 6 on April 16, 2013. The motions have been briefed, and a hearing was held on June 4, 2013. Supplemental submissions were filed on June 7 and 13, 2013, and on August 19, 2013.

## STATUTORY FRAMEWORK

### A. *The Indian Self-Determination and Education Assistance Act of 1975*

In 1975, Congress passed the Indian Self-Determination and Education Assistance Act of 1975, Pub. L. 93-638, 88 Stat. 2203 (codified at 25 U.S.C. §§ 450-458ddd-2) ("ISDA" or the "638 Act"). ISDA was enacted to "promote tribal autonomy by permitting Indian tribes to manage federally funded services that were previously administered by the federal government." *Arctic Slope Native Assoc., Ltd. v. Sebelius*, 583 F.3d 785, 788 (Fed. Cir. 2009); *see also* 25 U.S.C. § 450a. ISDA reiterates the government's:

> commitment to the maintenance of the [f]ederal [g]overnment's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the [f]ederal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

25 U.S.C. § 450a(b).

---

[2]The court had by order requested that the Council provide copies of the claims the Council had previously submitted to the Office. *See* Order of August 15, 2013, ECF No. 61. The Council promptly responded.

Pertinent to this litigation, ISDA confers upon the Secretary of the Interior the authority to "enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof." 25 U.S.C. § 450f(a)(1). A tribal organization is defined as

> the recognized governing body of any Indian tribe; *any legally established organization of Indians* which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities: *Provided, [t]hat in any case where a contract is let or grant made to an organization to perform services benefiting more than one Indian tribe, the approval of each such Indian tribe shall be a prerequisite to the letting or making of such contract or grant.*

25 U.S.C. § 450b(*l*) (emphasis added).

ISDA sets forth a model agreement that must be contained within, or incorporated by reference in, any self-determination contract entered into pursuant to 25 U.S.C. § 450f(a)(1). *See* 25 U.S.C. § 450*l*(a), (c); *see also Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075, 1082 (Fed. Cir. 2003) ("The ISDA requires that every self-determination contract incorporate the terms of a model agreement, which is provided by 25 U.S.C. §§ 450*l*(c).").

Additionally, amendments to ISDA in 1988 made the Contract Disputes Act ("CDA"), now codified at 41 U.S.C. §§ 7101-7109, applicable to disputes concerning self-determination contracts. *See* 5 U.S.C. § 450m-1(d); *see also Arctic Slope*, 583 F.3d at 789.[3]

B. *Indian Employment, Training and Related Services Demonstration Act of 1992*

In 1992, Congress passed the Indian Employment, Training and Related Services Demonstration Act of 1992, Pub. L. 102-477, 106 Stat. 2303 (codified at 25 U.S.C. ch. 36, §§ 3401-3417) ("the 477 Act"). The purpose of the 477 Act was "to demonstrate how Indian tribal governments can integrate the employment, training and related services they provide in order to improve the effectiveness of those services, reduce joblessness in Indian communities and serve tribally-determined goals consistent with the policy of self-determination." 25 U.S.C. § 3401. In essence, the 477 Act was designed to simplify and streamline the fund disbursal and reporting processes. The law instructs that the Secretary of the Interior

> shall, upon the receipt of a plan acceptable to the Secretary of the Interior submitted by an Indian tribal government, authorize the tribal government to coordinate, in accordance with such plan, its federally funded employment, training, and related services programs in a manner that integrates the program

---

[3]As amended, Subsection 450m-1(d) provides that "Chapter 71 of Title 41 shall apply to self-determination contracts, except that all administrative appeals relating to such contracts shall be heard by the Interior Board of Contract Appeals established pursuant to section 8 of such Act[, 41 U.S.C. § 7105]." 25 U.S.C. § 450m-1(d).

services involved into a single, coordinated, comprehensive program and reduces administrative costs by consolidating administrative functions.

25 U.S.C. § 3403. The programs authorized under this Chapter are often referred to as "477 programs." Def.'s Mot. at 5. The 477 Act does not authorize the distribution of funds; rather, funding is obtained under other applicable statutes. *See, e.g.,* 25 U.S.C. § 3408(a) ("The plan submitted by a tribal government may involve the expenditure of funds . . . if such expenditures are . . . consistent with the purposes specifically applicable to Indian programs in the statute under which the funds are authorized."); Office of Management and Budget, Compliance Supplement, Circular No. A-133 (June 2012), 2012 WL 6764077, at *735 ("Pub. L. No. 102-477 refers to the Indian Employment, Training and Related Services Demonstration Act of 1992, *the purpose of which is to provide for the integration of employment, training and related services* to improve the effectiveness of those services.") (emphasis added).

## BACKGROUND[4]

On February 17, 2009, Congress enacted the American Recovery and Reinvestment Act of 2009 ("ARRA"), Pub. L. 111-5, 123 Stat. 115, in which, among other things, it allocated $40 million to the Bureau of Indian Affairs for the operation of Indian "workforce training programs and the housing improvement program." Pub. L. 111-5, 123 Stat. 115, at tit. VII. Some of these funds were apportioned internally to the Office, a component of the Bureau. In addition, ARRA allocated $550 million to FHWA "for investments in transportation at Indian reservations and [f]ederal lands." *Id.* at tit. XII.

On June 1, 2009, the Office wrote to Spirit Lake and stated that funds had been allocated to the Tribe under the provisions of ARRA. *See* Def.'s Mot. App. at A40 (Letter from Robert Middleton, Director of the Office, to Myra Pearson, chairperson of Spirit Lake). The funds would be administered through Contract No. GTK00T109AR ("the ARRA contract"), *see* Def.'s Mot. App. at A39 (Letter from Middleton to Pearson (June 1, 2009)), a 638 contract between the Office and the Tribe, *see id.* at A41 (ARRA Contract Agreement). The ARRA contract was awarded on June 8, 2009. Def.'s Mot. App. at A80. The ARRA contract's purpose was to "provide Indian [e]mployment, [t]raining, and [r]elated [s]ervices in accordance with the terms, provisions[,] and conditions of this contract and funding agreement; and provisions of [ARRA]." Def.'s Mot. App. at A43 (638 Act, Section 108 Model Agreement for the ARRA Contract).

A. *Amendment 2 to the ARRA Contract*

On August 5, 2009, the Office issued Amendment 2 to the ARRA contract. Def.'s Mot. App. at A83 (Amendment 2), A110 (ARRA Contract Amended Funding Agreement). Amendment 2 identified the Office and Spirit Lake as the parties to the ARRA contract, *id.* at A83, and noted that the "Contractor, Recipient, Tribe (ARRA related)" was Spirit Lake, *id.* at A88 (ARRA Contract Amended Funding Agreement). Amendment 2 was signed by Ms. Lynn

---

[4]The recitations that follow do not constitute findings of fact by the court. Instead, the recitals are taken from the parties' filings and either are undisputed or alleged and assumed to be true for purposes of the pending motions, except where a factual controversy is explicitly noted.

Forcia, an awarding official from the Office, and Ms. Myra Pearson, chairperson of Spirit Lake. *Id.* at A83 (Amendment 2). Amendment 2 allocated ARRA funds for a Solar Heat Panel Training and Installation Project and the Native Construction Careers Initiative ("NCCI") Project, a commercial construction training program. *Id.* at A94 (ARRA Contract Amended Funding Agreement). Separate statements of work for the two projects were attached. *See id.* at A111-13 (Solar Heat Panel Installation Training Project Statement of Work), A114-24 (NCCI Project Statement of Work); *see also id.* at A94 (noting that statements of work for the two projects were attached to the amended funding agreement statement of work). The statement of work for the NCCI aspect noted that the Council "has nine (9) proposed projects called the Native Construction Careers Initiative (NCCI) to work with tribes nationwide to provide hands-on commercial construction training. [Spirit Lake] is well positioned to assist [the Council] to conduct these activities, to ensure contract compliance, issue quarterly payments, to collect quarterly data reports[,] including program and financial[,] from [the Council,] and related tasks. . . . Therefore, [Spirit Lake] proposes to enter into a contract with [the Council] to conduct the [NCCI]." *Id.* at A114. The statement of work identified eight Indian tribes and one Alaska Native Village which would be involved in the arrangement between the Council and Spirit Lake. *See id.* The statement of work also described the types of training to be afforded to each tribe or native village. *Id.* at A115-119. Additionally, it set forth the responsibilities of both the Council and Spirit Lake. The Council's responsibilities included performance of the training projects for each of nine tribes and villages and completion of various ARRA reporting requirements. *Id.* at A119-21. Spirit Lake's responsibilities included "administer[ing] the NCCI project to ensure that the goals of the project are being met, including on-site program monitoring as needed," "transfer[ring ARRA] funds to [the Council]," and "monitor[ing] the progress of the [Council's] activities and provid[ing] quarterly reports to the Public Law 102-477 Tribal Work Group." *Id.* at A121. According to the statement of work, the NCCI project was to be funded by a $950,000 "award under [ARRA]." *Id.* The NCCI statement of work included a page for representatives from the Office, Council, and Spirit Lake to sign and acknowledge their acceptance of the terms. *See id.* at A123. Ms. Forcia, the awarding official, signed on behalf of the Office on August 5, 2009. *Id.* Representatives from Spirit Lake and the Council signed to acknowledge their acceptance of the terms on August 11 and 12, 2009, respectively. *Id.* at A124.

B. *Interagency Agreement between the Office and FHWA*

On September 16, 2009, the Office and the FHWA entered into an interangency agreement, Def.'s Mot. App. at A126 (Office-FHWA Interagency Agreement), which allowed the Office to use $1.5 million of the funds allocated to FHWA by ARRA to "provide support to disadvantaged tribes and tribal members to increase their participation in the highway construction workforce," *id.* at A127. The statement of work that accompanied the interagency agreement noted that the Office in the past had collaborated with the Council to "establish[] partnerships with prime contractors and develop[] matchmaking opportunities to mentor Indian firms and provide supportive services to increase the American Indian Highway Construction business quotes/bids on highway construction projects." *Id.* at A130 (Office-FHWA Interagency Agreement Statement of Work). The statement of work also lists the Council as a "key partner," *id.* at A136, A139, and notes that $500,000 of the $1.5 million in available funds would be allocated to the Council to "provide funding for the [NCCI] that will be conducting on-site apprenticeship training programs to at least 6 tribes," *id.* at A143.

## C. *Amendment 6 to the ARRA Contract*

On June 11, 2010, the Office issued Amendment 6 to Spirit Lake's ARRA contract. *See* Def.'s Mot. App. at A150 (Amendment 6); *see also id.* at A148 (Letter from Middleton to Pearson (June 11, 2010)). Amendment 6 identified the Office and Spirit Lake as the parties to the ARRA contract, *id.* at A150, and noted that the "Contractor, Recipient, Tribe (ARRA related)" was Spirit Lake, *id.* at A155 (ARRA Contract Second Amended Funding Agreement). Amendment 6 was signed by Ms. Forcia of the Office, and Ms. Pearson of Spirit Lake. *Id.* at A150. The statement of work for Amendment 6 noted that the funds were to be used in part to support the "Department of Transportation-Federal Highway Administration's approved training projects," for which a separate statement of work was attached. *Id.* at A161 (ARRA Contract Second Amended Funding Agreement Statement of Work). That statement of work, entitled "Council for Tribal Employment Rights (CTER) Statement of Work for FHWA Project" ("FHWA Project Statement of Work"), noted that the purpose of Amendment 6 was "a modification to the current ARRA contract between [Spirit Lake, Council,] and adding the National Indian Ironworkers training center that is an ARRA project under an interagency agreement that is between [FHWA] and [t]he Department of the Interior/Indian Affairs." *Id.* at A187 (FHWA Project Statement of Work). The statement of work allocated $500,000 to the Council to "develop Indian preference certification programs for road construction activity" to six Indian tribes. *Id.* The statement of work asserted that Spirit Lake was "well positioned" to assist the Council in conducting its activities, *id.*, and made the following representation: "Therefore, [Spirit Lake] proposes to enter into a contract with [the Council] and the National Indian Ironworkers Training Program to administer the [FHWA-Office] Training Initiative," *id.* at A188.

The statement of work for the FHWA project also assigned reporting requirements to the Council. Def.'s Mot. App. at A188-89. Spirit Lake's duties included "administer[ing] the [Office-FHWA] project to ensure that the goals of the project are being met" and transferring funds to the Council and the National Indian Ironworkers. *Id.* at A190. The statement of work for the FHWA project was signed by Ms. Forcia for the Office on June 11, 2010, by Ms. Pearson for Spirit Lake on June 28, 2010, and by Mr. Conrad Edwards, president of the Council, on June 21, 2010. *Id.* at A192-93. It appears to include handwritten changes made by Mr. Edwards on June 21, which were initialed and accepted by Ms. Forcia on July 6, 2010. *See id.* at A188, A190.

## D. *The Awarding Official's Authority*

At the times Ms. Forcia, the government awarding official, signed Amendments 2 and 6, she was designated as a "Level I Awarding Official" for the Office. *See* Def.'s Mot. App. at A1-2 (Forcia Certification). Such designations are supervised by the Bureau, *see id.* at A1, which also publishes the "Indian Self-Determination Awarding Official Certification System (AOCS) Handbook" to give context to, and details about, the designation, *id.* at A3-38 (AOCS

6

Handbook). The handbook is available to the public online.[5] The handbook defines "Awarding Official" to mean a contracting officer possessing the authority to issue self-determination contracts and grants under ISDA:

> "Awarding Official" means Contracting Officer and shall be any person in the self-determination career field, who has been certified under the Awarding Official Certification System as an Awarding Official, other than an Approving Official, who has the delegated authority to award, modify, and administer all self-determination contracts as defined in the 25 U.S.C.A. Section 450b(j), including where applicable construction contracts as defined in 25 U.S.C.A. Section 450b(m), as amended, and shall make decisions and issue findings and determinations with respect thereto. The awarding official shall also have the authority to award, modify[,] and administer self-determination grants.

*Id*. at A8. The handbook further notes that a "Level I Awarding Official" has authority that "covers *all self-determination non-construction contracts, and grants*." *Id.* at A11 (emphasis added). Ms. Forcia's authority, however, was encumbered with an additional limitation not expressly contemplated by the Bureau's handbook. According to a letter from the director of the Bureau approving Ms. Forcia as a Level I Awarding Official, Ms. Forcia was "conditionally approved . . . as a Level I Awarding Official to award only Pub. L. 102-477 grants." *Id*. at A1; *see also id.* at A2.

### E. *Alleged Breach*

In September 2011, Mr. Edwards, president of the Council, sent a letter to the Assistant Secretary for Indian Affairs at the Department of the Interior, stating that he had provided a letter to the assistant secretary almost a year earlier, in October 2010, "describing how two employees of [the Office] were engaged in inappropriate behavior designed to block [the Council] from successfully implementing the NCCI program." Def.'s Mot. App. at A201 (Letter from Edwards to The Hon. Larry Echo Hawk, Assistant Secretary, Indian Affairs, Department of the Interior (Sept. 14, 2011)). Mr. Edwards stated that Office employees subsequently had sent by facsimile copies of his October 2010 letter to "every 477 job training director in the country to turn those programs against [the Council]. One of those recipients was the director of [Spirit Lake's] 477 program, who . . . served as administrator of [the Council's] NCCI contract. . . . She has since refused to take any steps to release to [the Council] the $500,000 due [the Council] under its NCCI contracts, including funds for training programs [the Council] has already provided to tribes in Nevada." *Id.* at A202.

Four months later, on February 21, 2012, the Council submitted to Karen Atkinson, Director of the Office, a certified claim for $200,000 related to the government's alleged breach of contract with respect to Amendment 2 and the NCCI program. *See* Pl.'s Resp. to Order of August 15, 2013, Attach. A. On March 13, 2012, the Council submitted to Ms. Atkinson a

---

[5]*See Indian Self-Determination Awarding Official Certification System (AOCS) Handbook*, Bureau of Indian Affairs, http://www.bia.gov/cs/groups/xraca/documents/text/idc-000560.pdf (last visited August 23, 2013).

second certified claim for $300,000 related to an alleged breach of contract with respect to Amendment 6 and the FHWA project. *Id.*, Attach. B. The Office did not respond to these claims. Def.'s Mot. at 10. On May 23, 2012, the Council filed its complaint in this court alleging breach of contract and requesting $500,000 in damages. *See* Compl. at 1.

## STANDARDS FOR DECISION

### *Jurisdiction*

Subject matter jurisdiction must be established before a case can proceed on its merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998). In considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), the court will ordinarily construe the allegations of the complaint favorably to the pleader. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Air Prod. & Chems., Inc. v. Reichhold Chems., Inc.*, 755 F.2d 1559, 1562 n.4 (Fed. Cir. 1985)). Nonetheless, the burden of establishing the court's jurisdiction rests with the party seeing to invoke it, *McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936), and this burden must be satisfied by a preponderance of the evidence, *Reynolds*, 846 F.2d at 748.

### *Motion to Dismiss for Failure to State a Claim*

A complaint must be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). While "'the allegations of the complaint should be construed favorably to the pleader,'" *Grayton v. United States*, 92 Fed. Cl. 327, 331 (2010) (quoting *Scheuer*, 416 U.S. at 236), "[t]he court must also inquire whether the complaint meets the 'plausibility standard' . . . , *i.e.*, whether it adequately states a claim and provides a 'showing [of] any set of facts consistent with the allegations in the complaint,'" *id.* at 331-32 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 560-63 (2007)). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. If the plaintiff has not alleged a set of facts constituting a plausible claim to relief, the complaint will be dismissed for failure to state a claim upon which relief can be granted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).

### *Motions for Summary Judgment*

A grant of summary judgment is warranted when the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute is one that "may reasonably be resolved in favor of either party." *Id.* at 250.

The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

8

Accordingly, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). In this case, both parties have filed a motion for summary judgment. Because cross-motions for summary judgment are pending, the court must evaluate each motion on its own merits and "tak[e] care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

To establish "that a fact cannot be or is genuinely disputed," a party must "cite[] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," RCFC 56(c)(1)(A), or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," RCFC 56(c)(1)(B). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## ANALYSIS

### I. Express Contract Claims

#### A. *Tucker Act Jurisdiction*

"Absent an unequivocal consent to suit, [this court] lacks authority to grant relief against the United States." *Travelers Cas. & Sur. Co. of Am. v. United States*, 103 Fed. Cl. 101, 103 (2012) (citing *United States v. Testan*, 424 U.S. 392, 399 (1976)). Under the Tucker Act, this court has subject matter jurisdiction over disputes arising under the recodified Contract Disputes Act. *See* 28 U.S.C. § 1491(a)(2).[6] As discussed *supra*, the CDA applies to self-determination contracts entered into pursuant to ISDA, except that all "administrative appeals relating to such contracts shall be heard by the Interior Board of Contract Appeals." 25 U.S.C. § 450m-1(d); *see also Arctic Slope*, 583 F.3d at 789 ("The 1988 amendments to the ISDA made the Contract

---

[6]In pertinent part, the Tucker Act as amended provides that

> [t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act [, 41 U.S.C. § 7103].

28 U.S.C. § 1491(a)(2).

Disputes Act applicable to disputes concerning self determination contracts. As a result, ISDA self-determination contractors can appeal an adverse decision by a contracting officer on contract disputes to the Civilian Board of Contract Appeals [the successor to the Interior Board of Contract Appeals] or to the Court of Federal Claims." (internal citations omitted)). The CDA requires "contractors," defined as "part[ies] to a [f]ederal [g]overnment contract other than the [f]ederal [g]overnment," 41 U.S.C. § 7101(7), to submit claims against the government in writing to a contracting officer for a decision, 41 U.S.C. § 7103(a). Claims of more than $100,000 must be certified by an individual authorized to bind the contractor with respect to the claim. 41 U.S.C. § 7103(b). After a decision or a lack of a decision by the contracting officer, the contractor can then bring suit in this court. 41 U.S.C. § 7104(b)(1).[7]

The government asserts that the Council's claims should be dismissed for lack of subject matter jurisdiction because no valid contracts were entered between the Council and the Office. *See* Def.'s Mot. at 16, 19. However, the Federal Circuit has held that "jurisdiction under [the Tucker Act] requires no more than a non-frivolous *allegation* of a contract with the government." *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) (emphasis in original). "The actual *existence* of a contract is not a jurisdictional matter but rather a decision on the merits of the case." *Liberty Ammunition, Inc. v. United States*, 101 Fed. Cl. 581, 586-87 (2011) (citing *Engage Learning*, 660 F.3d at 1354-55 (in turn citing *Bell v. Hood*, 327 U.S. 678, 682 (1946))) (emphasis in original). Here, the Council has asserted that it was a party to contracts with the government entered pursuant to ISDA. *See* Compl. ¶¶ 10-35. The parties have provided copies of the agreements at issue. *See* Def.'s Mot. App. at A81-125 (Amendment 2 and Related Documents); A148-A200 (Amendment 6 and Related Documents). Although the government has challenged the validity of those contracts, *see, e.g.*, Def.'s Mot. at 20-23 (arguing that the awarding official had no authority to bind the United States in contract with the Council), that challenge does not, and cannot, jurisdictionally bar the court from examining the Council's claim that it has entered into express contracts with the government.

Moreover, for the purpose of the court's jurisdictional inquiry, the Council also qualifies as a "contractor" under the CDA. Additionally, the Council's submissions of its written, certified claims to the director of the Office satisfy the requirements of the CDA. *See, e.g., Tri-Ad Constructors v. United States*, 21 Cl. Ct. 789, 791-92 (1990) (deeming that a claim was submitted to the contracting officer within the meaning of the CDA even though the claim was embodied in letter addressed to another official in the contracting officer's office); *American Pac. Roofing Co. v. United States*, 21 Cl. Ct. 265, 267-68 (1990) (same); *see also J & E Salvage Co. v. United States*, 37 Fed. Cl. 256, 262 (1997) (noting that in *Tri-Ad* and *American Pacific*, jurisdiction was found because the submissions were made to the appropriate procurement agency and logically found their way to the pertinent contracting officer). Accordingly, this case is properly before the court, and the Council's complaint will not be dismissed for lack of subject matter jurisdiction.

---

[7]"Failure by a contracting officer to issue a decision on a claim within the required time period [60 days or a reasonable time period] is deemed to be a decision by the contracting officer denying the claim and authorizes an appeal or action on the claim as otherwise provided in this chapter." 41 U.S.C. § 7103(f)(5).

B. *Authority to Enter the Contracts Between the Council and the Government*

The government next urges this court to reject the Council's claims regarding the existence of contracts between Council and the government because Ms. Forcia — the awarding official who signed the agreements — lacked the requisite authority to bind the United States in contract. *See* Def.'s Mot. at 20.

1. *A non-published limitation on the contracting officer's authority.*

To establish an express contract with the United States, a plaintiff "must show a mutual intent to contract[,] including an offer, an acceptance, and consideration." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). A "contract with the United States also requires that the [g]overnment representative who entered or ratified the agreement had actual authority to bind [the government]." *Id.* "[A]ny party entering into an agreement with the [g]overnment accepts the risk of correctly ascertaining the authority of the agents who purport to act for the [g]overnment." *Monarch Assurance P.L.C. v. United States*, 244 F.3d 1356, 1360 (Fed. Cir. 2001); *see also Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947) ("[A]nyone entering into an arrangement with the [g]overnment takes the risk of having accurately ascertained that he who purports to act for the [g]overnment stays within the bounds of his authority."). The Court in *Federal Crop Insurance* cautioned that "[t]he scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though . . . the agent himself may have been unaware of the limitations upon his authority." 332 U.S. at 384.

The Federal Circuit's application of the rule espoused in *Federal Crop Insurance* has continued to place the burden of knowing the scope of a contracting officer's authority on the contractor.[8] In one instance, a question arose concerning a contracting officer's authority to enter oral rather than written contracts. The contracting officer's specific delegation of authority noted that he could take any "necessary and appropriate action" with respect to certain financial incentive awards made to contractors. *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed. Cir. 1998). The delegation of authority, however, noted that "a separate prior *written* approval of any such action must be given by or concurred in by [the contracting officer] to accompany the action." *Id.* (emphasis added). The delegation of authority was provided to the contractors as part of the closing documents for the project. *Harbert/Lummus Agrifuels Projects v. United States*, 36 Fed. Cl. 494, 500 (1996), *aff'd in part, vacated in part, and rev'd in part,* 142 F.3d 1429.[9] The Federal Circuit stated that "[t]he burden was on [the

---

[8]This court and its predecessor have relied on *Federal Crop Insurance* in placing the burden on contractors to ascertain any dollar limitations that restrict the authority of contracting officers with whom they interact. *See*, *e.g.*, *Edwards v. United States*, 22 Cl. Ct. 411, 420-21 (1991) (stating that the government could not be bound if a contracting officer agreed to a contract modification of a size, cost, and scope for which Postal Service regulations required approval of superiors).

[9]The Federal Circuit noted in its decision that "the facts of [the] case have been set out in great detail in the trial court's decision and will be referred to in this opinion only to the extent

plaintiff] to prove that the [contracting officer] had the authority to enter into the oral, unilateral contract." *Harbert/Lummus*, 142 F.3d at 1432. The court continued:

> It appears evident that, if Harbert/Lummus had examined the [contracting officer's] delegation of authority, it could not have reasonably believed it had entered into a binding contract with the government in the absence of the required written approval by the [contracting officer]. Because there is no evidence of such prior, written approval by the [contracting officer] of the unilateral contract, we hold that the [contracting officer] lacked the authority to enter into the oral contract and it is therefore not binding upon the government.

*Id.* at 1433.

Nonetheless, the Federal Circuit has acknowledged that the government must provide evidence that an act is outside a contracting officer's authority if such an act is *prima facie* within the contractor's area of assignment:

> Attorney argument is insufficient to overcome the presumed regularity of an act of contract administration that is *prima facie* within the contracting officer's assignment. In contrast, in *Federal Crop Insurance* a publicly available regulation expressly prohibited the act of the government agent on which the private contractor had relied. . . . When the actions of the contracting officer are within the authority that pertains to the subject matter of the contract, and no statute or regulation limits that authority, as in *Federal Crop Insurance*, the agency bears the burden of coming forward with evidence of lack of authority for the actions of the contracting officer. This burden is not met simply by attorney allegation in a litigation context.

*LDG Timber Enters., Inc. v. Glickman*, 114 F.3d 1140, 1143 (Fed. Cir. 1997). The Federal Circuit in *LDG Timber* observed in that case that "[n]o statute, regulation, or rule was cited as violated by the contract extensions and representations of [the contracting officer], and indeed nothing in these routine arrangements reasonably suggested lack of authority." *Id.* Consequently, denial of plaintiff's claim could not be sustained on the ground that the contracting officer exceeded his authority. *Id.*

Taken together, these cases establish a general rule that places the burden of knowledge of the scope of a contracting officer's authority on a contractor, so long as the government has provided evidence of the scope of the authority of the official in question. Here, Ms. Forcia, the government representative who signed Amendments 2 and 6, bore the title of "Level I Awarding Official." *See* Def.'s Mot. App. at A1. The Bureau's publicly available handbook stated that officials holding that designation had the authority to enter into "self-determination non-construction contracts, and grants." *Id.* at A11. Despite this apparent indication of authority, the

---

necessary for an understanding of the issues that give rise to this appeal." *Harbert/Lummus*, 142 F.3d at 1430.

Bureau had specifically restricted the scope of Ms. Forcia's authority by certifying her with the authority to award only grants under Pub. L. 102-477. *See id.* at A2.

This constraint must be judged against the fact that 477 authority relates to a program that does not independently provide for grants or other funding. *See, e.g.,* 25 U.S.C. § 3408(a); Def.'s Resp. to Pl.'s Mot. for Partial Summary Judgment ("Def.'s Resp."), Attach. 2 (Declaration of Terrence Parks, Division Chief for Self Determination, Office of Indian Services for the Bureau of Indian Affairs (May 16, 2013)) ("Parks Decl.") ¶ 3, ECF No. 53-2 ("All the funds distributed through the [477 program] are those which the [t]ribe would otherwise receive under the authority of the individual programs it chooses to consolidate in its '477' plan."). These circumstances present the court with a conundrum regarding the scope of Ms. Forcia's authority. Taken literally, the mandate that Ms. Forcia was "delegated the authority to award only P.L 102-477 grants," Def.'s Mot. App. at A2, would render her awarding authority meaningless, as the 477 Act does not provide for grants. Accordingly, the court must look to the purpose and intent of the programs created under the authority of the 477 Act to avoid such an absurd result. *Cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

The Parks Declaration is of some aid to the court in deciphering what the Department of the Interior means when referring to 477 grants. Mr. Parks confirms that the 477 program allows tribes "to combine [f]ederal grant funds related to *employment and training activities* into a single plan with a single budget and a single reporting system. . . . No separate funding or contracting authority is associated with the 477 demonstration project." Parks Decl. ¶ 3 (emphasis added). According to Mr. Parks, "[t]raditionally, all 477 program funds are distributed through [ISDA] agreements." *Id.* He further explains that Ms. Forcia, who was directly involved with the 477 program, "did not need general contracting authority or general self-determination agreement authority because the 477 demonstration project does not encompass these areas. Therefore, her authority was specifically limited to grant agreements under the 477 demonstration project whereby the funding would be distributed through an [ISDA] agreement." *Id.* ¶ 4. In Mr. Parks's view, this meant that "she could only award funds within the 477 demonstration project. For instance, law enforcement services are proper to include in a typical [ISDA] agreement, but are not encompassed by the 477 demonstration project and, therefore, Ms. Forcia had no delegated authority to award funds for a law enforcement program." *Id.* ¶ 5. In short, Mr. Parks explained that the 477 grant limitation on Ms. Forcia's authority restricted the subject matter of the ISDA agreements to which she could bind the government.

In addition to limiting the subject matter of the ISDA agreements, the 477 grant restriction ostensibly limits the parties with whom Ms. Forcia had the authority to contract. While ISDA enables the government to enter into self-determination contracts with tribes and tribal organizations, *see* 25 U.S.C. § 450f(a)(1), the 477 Act only allows for the consolidation of funds as authorized by the government of an Indian tribe under the tribal government's 477 plan as approved by the Secretary of the Interior. *See* 25 U.S.C. §§ 3403, 3405. The 477 Act defines Indian tribe to mean "any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village . . . which is recognized as eligible for the special programs

13

and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 3402(2) (477 program); *see also* 25 U.S.C. § 450b(e) (ISDA).

In the instant case, Amendments 2 and 6 were modifications to the ARRA contract, entered pursuant to ISDA. Moreover, the projects contemplated by Amendments 2 and 6 were workplace training programs, which are encompassed within the authorization of the 477 Act. *See* 25 U.S.C. § 3403 ("The Secretary . . . shall upon the receipt of a plan acceptable to the Secretary of the Interior submitted by an Indian tribal government, authorize the tribal government to coordinate, in accordance with such plan, its federally funded *employment, training, and related services programs* in a manner that integrates the program services involved into a single, coordinated, comprehensive program.") (emphasis added). Accordingly, Ms. Forcia possessed the authority to enter into Amendments 2 and 6 with Spirit Lake, a federally recognized Indian tribe. She could not, however, also contract with the Council, which is not an Indian tribe and, for purposes of this case, is also not a qualifying tribal organization, as explained *infra*.[10] Accordingly, the Council cannot prevail on its claims that Amendments 2 and 6 were express, three-party contracts between Spirit Lake, the government, and the Council, because Ms. Forcia did not have the authority to bind the government to agreements that included the Council as a party.[11]

---

[10]Given the precedents established by the Supreme Court and the Federal Circuit regarding the authority of contracting officers, the court is precluded from finding merit in Council's argument that requiring a contractor to ascertain the scope of authority of a government official "would impose huge delays and burdens on the [f]ederal contracting process." *See* Pl.'s Resp. to Def.'s Mot. to Dismiss and, in the Alternative, for Summary Judgment, and Pl.'s Mem. in Support of its Mot. for Partial Summary Judgment ("Pl.'s Cross-Mot.") at 31, ECF No. 46. The Federal Acquisition Regulations require that "[i]nformation on the limits of the contracting officers' authority shall be readily available to the public and agency personnel." 48 C.F.R. § 1.602-1(a). In this instance, information about Ms. Forcia's authority was not "readily available." *Id*. Moreover, even if information about the limitation on Ms. Forcia's authority had been obtainable by making a query to the Office, considerable uncertainly would have arisen because the interaction of the 477 program with ISDA is not apparent from the pertinent statutory language. Additionally, a query to the Office probably would not have been of help to the Council in evaluating the question of authority. As the facts and circumstances of this case demonstrate, the Office was itself under a misapprehension about the scope of Ms Forcia's authority.

[11]The Department of the Interior's Office of Inspector General investigated the circumstances surrounding the letting of Amendment 2. *See* Pl.'s Sur-Reply Mem. of Law ("Pl.'s Sur-Reply"), Ex. A (Mem. from Robert A. Knox, Assistant Inspector General for Recovery Oversight to Chris Henderson, Senior Advisor to the Secretary for Recovery and Stimulus, Department of the Interior) ("OIG Mem.") at 1, ECF No. 52-1. In an advisory opinion, the Assistant Inspector General observed that the aim of the project — "to bring basic construction training to tribal individuals on reservations where unemployment rates are approaching 50 [percent]" — was laudable. OIG Mem. at 3. The Assistant Inspector General concluded, however, that the Office had "circumvented the Public Law 93-638 process and

14

2. *A statutory prerequisite to contract entry.*

A further question arises respecting compliance with a restriction in ISDA, namely, that all grants are to be made to tribes or to "tribal organization[s]." 25 U.S.C. § 450f. The specific issue is whether the Council qualifies as a tribal organization in the circumstances of the awards in this case. "[I]n interpreting a statute a court should always turn first to one, cardinal canon [of statutory interpretation] before all others." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992). The Supreme Court has instructed "time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* at 253-54 (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241-42 (1989); *United States v. Goldenberg*, 168 U.S. 95, 102-03 (1897); *Oneale v. Thornton*, 10 U.S. (6 Cranch) 53, 68 (1810)). Accordingly, "[w]hen the words of a statute are unambiguous . . . this first canon is also the last: 'judicial inquiry is complete.'" *Id.* at 254 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)). Put another way, "when the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms." *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000) (internal quotations omitted)).

As discussed *supra* p. 3, ISDA gives the Secretary of the Interior the authority to "enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof" for the benefit of Indians. 25 U.S.C. § 450f(a)(1).[12] Again, a tribal organization is defined as:

> the recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities: *Provided*, [t]hat in any case where a contract is let or grant made to an organization to perform services benefiting more than one Indian tribe, *the approval of each such Indian tribe shall be a prerequisite to the letting or making of such contract or grant.*

25 U.S.C. § 450b(*l*) (emphasis added). The language of the proviso to Subsection 450b(*l*) provides a plain directive: a contract under ISDA cannot be let or made to an organization to perform services benefiting more than one Indian tribe without the prior approval of each Indian tribe that is to benefit.

In this instance, the government and Spirit Lake entered into the ARRA contract pursuant to ISDA. *See* Def.'s Mot. App. at A41 (ARRA Contract), A43 (ARRA Contract Attached Model

---

created a relationship between [the Council] and [Spirit Lake]," *id.* and he advised that "this contract was contrary to Public Law 93-638." *Id.*

[12]ISDA also requires that a model agreement, outlined at 25 U.S.C. § 450*l*(c), be incorporated into each self-determination contract entered into under ISDA. 25 U.S.C. § 450*l*(a). The requisite model agreement was appended to the ARRA contract. *See* Def.'s Mot. App. at A42-51 (ARRA Contract Attached Model Agreement).

15

Agreement). Amendments 2 and 6 modified that ARRA contract. Amendment 2 included a statement of work for the NCCI project that described the types of construction training the Council would provide to eight Indian tribes and one Alaska Native Village, and it identified by name the eight Indian tribes and one Alaska Native Village who would be involved. *See id.* at A114-19. Amendment 6 also contemplated that the Council would provide training assistance to multiple tribes. *Id.* at A187 ("[the Council] will provide training that will be conducted in groups. . . . [T]he training should be associated with a federal highway/roads project, for at least 6 tribal projects at the cost of $50,000 per tribal project."); *see also id.* at A188 ("The contract will involve six [t]ribal projects identified by [the Council]."). Amendment 6 required the Council to identify the tribes to which it would provide services and to provide the government with tribal resolutions agreeing to the projects by July 31, 2010, *id.* at A188,[13] a date occurring about a month after Spirit Lake, the Council, and Ms. Forcia had signed and entered into Amendment 6, *see id.* at A192-93. No written approval from any Indian tribe other than Spirit Lake appears in the record, and neither party asserts that such approvals existed prior to the execution of Amendments 2 and 6.

Both parties acknowledge that it had been customary for officials at the Office and the Bureau to enter into certain types of contracts designed to benefit multiple tribes without receiving approval from each tribe prior to the making of such a contract, as required by Subsection 450b(*l*). Pl.'s Sur-Reply at 6-9; Hr'g Tr. 15:18 to 17:19 (June 4, 2013).[14] The Council argues that the Office's prior practice requires the court to give deference to the Office's and the Bureau's "interpretation" of Subsection 450b(*l*), Pl.'s Sur-Reply at 6-9, but during briefing, neither the Council nor the government could provide evidence of a written interpretation by the Bureau concerning Subsection 450b(*l*). After the hearing, the government provided a notice of supplemental authority, alerting the court to a regulation adopted by the Bureau, located at 25 C.F.R. § 900.8. *See* Def.'s Notice of Supplemental Authority (June 7, 2013), ECF No. 57. The regulation states that an initial contract proposal under ISDA must contain a "copy of the authorizing resolution from the Indian tribe(s) to be served. . . . If an Indian tribe or tribal organization proposes to serve a specified geographic area, it must provide authorizing resolution(s) from all Indian tribes located within the specific area it proposes to serve. However, no resolution is required from an Indian tribe located outside the area proposed to be served whose members reside within the proposed service area." 25 C.F.R. § 900.8(d). This regulation elaborates upon, but does not displace, the mandate in Subsection 450b(*l*) that

---

[13]The Council argues that 25 U.S.C. § 450b(*l*) does not apply to Amendment 6 because the Council "could not be required to obtain resolutions from tribes that had not yet been identified" and because the pertinent statement of work "specifically required [the Council] to obtain a resolution from each tribe selected through the assessment process before [the Council] could start work on that tribe's reservation." Pl.'s Sur-Reply at 6. This argument cannot be accepted. A contract that contemplates the provision of benefits to multiple tribes cannot avoid compliance with the plain language of ISDA simply by being indefinite as to the identity of the tribes to be benefited. Nor can a call for future resolutions as stated in the contract displace a statutory directive that requires resolutions of tribes as a "prerequisite" to a contract or grant. 25 U.S.C. § 450b(*l*).

[14]Subsequent citations to the hearing held on June 4, 2013 will omit the date.

each Indian tribe to be benefited by a contract must approve the contract as a "prerequisite" for entry into the contract.[15]

In all events, initially the court must address "the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Only "if the statute is silent or ambiguous with respect to the specific issue" does the court consider and afford deference to the agency's interpretation of a statute. *Id.* at 243. Because Subsection 450b(*l*) is unambiguous, any contrary interpretation by the agency would not be entitled to the deference which Council urges.[16]

In short, the Council did not come within the definition of a "tribal organization" specified by ISDA to be eligible to form a contract in the circumstances at hand, and Amendments 2 and 6 contravene ISDA as a result.

3. *Consequences of the contracting officer's absence of authority.*

The court must next consider whether violation of ISDA renders Amendments 2 and 6 unenforceable. "Invalidation of [a] contract is not a necessary consequence when a statute or regulation has been contravened, but must be considered in light of the statutory or regulatory purpose, with recognition of the strong policy of supporting the integrity of contracts made by and with the United States." *American Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1374 (Fed. Cir. 1999) (en banc) ("*AT&T*"). In the post-award bid protest context, the Court of Claims instructed that "where a problem of the validity of the invitation or the responsiveness of the accepted bid arises after the award, the court should ordinarily impose the binding stamp of nullity only when the illegality is plain." *John Reiner & Co. v. United States*, 325 F.2d 438, 440

---

[15]In the regulation, considerable ambiguity exists respecting the meaning of the exempting phrase "an Indian tribe located outside the area proposed to be served whose members reside within the proposed service area." 25 C.F.R. § 900.8(d)(1). The phrase suggests that a tribe as a federally dependent sovereign might be located outside the service area but that all, most, or some of its members might live within the area. It is axiomatic that the exempting phrase in the regulation could not contravene the pertinent language of the statute. In this instance, the court need not wrestle with the ambiguity and endeavor to square the exempting regulatory phrase with the statute because the parties have made no express argument that the exempting phrase applies to the circumstances at hand.

[16]The Bureau has now reached the same conclusion regarding ISDA's tribal-approval requirement for a contract or grant to a tribal organization. In an interview that the Office of Inspector General conducted with the Bureau's chief of the Division of Economic Development, the chief stated that "regional training will now require [t]ribal [r]esolutions from all the tribes in a particular region. National training will require tribal resolutions from all federally recognized tribes." Pl.'s Sur-Reply, Ex. B (OIG Investigative Activity Report — Interview of Jack Stephens, Chief, Division of Economic Development, Office of Inspector General for the U.S. Department of the Interior (Nov. 16, 2011)), at 2.

(Ct. Cl. 1963). "On the other hand, there are circumstances in which 'the departures from applicable statutes and regulations were both obvious to the bidder and *so substantial* as to require the conclusion that the putative contracts were void *ab initio*.'" *Fluor Enters., Inc. v. United States*, 64 Fed. Cl. 461, 492-93 (2005) (quoting *Trilon Educ. Corp. v. United States*, 578 F.2d 1356, 1360 (Ct. Cl. 1978) (emphasis in original)). Additionally, the Federal Circuit has cautioned that "[t]he invalidation of a contract after it has been fully performed is not favored. Precedent shows that those contracts that have been nullified, based on a failure to meet a statutory or regulatory requirement, are contracts that have not been substantially performed." *AT&T*, 177 F.3d at 1375 (citing *Alabama Rural Fire Ins. Co. v. United States*, 572 F.2d 727, 733–34 (Ct. Cl. 1978)).

ISDA states that its statutory provisions are designed to enable the "establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the [f]ederal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C. § 450a(b). To that end, the Secretary of the Interior is authorized to enter self-determination contracts with tribal organizations. 25 U.S.C. § 450f(a)(1). ISDA clarifies that each Indian tribe that is to benefit from a self-determination contract must give approval prior to entry into the contract. 25 U.S.C. § 450b(*l*). This requirement furthers the general purpose of ISDA, *i.e.*, to ensure Indian tribes have effective and meaningful participation in programs and services designed to benefit them. Thus, failure to comply with Subsection 450b(*l*) before executing Amendments 2 and 6 contravened a central tenet of the statute. Moreover, the departure from the plain directive of ISDA was obvious insofar as the need for prior tribal resolutions was concerned, even if the 477-grant limitation on the contracting officer's authority was not. Both the Council and the government were very familiar with the statute. In the circumstances, the circumvention of the requirements of Subsection 450b(*l*) renders the Amendments "plainly" violative of the statute and void *ab initio*.[17]

## II. Third-Party Beneficiary Claims

As an alternative theory of recovery, the Council has asserted that it was a third-party beneficiary to Amendments 2 and 6 of the ARRA contract between Spirit Lake and the Office, and that it was also a third-party beneficiary to the funding agreement between FHWA and the Office. Compl. at 1. The government responds that the third-party beneficiary claim relating to

---

[17]Amendments 2 and 6 seemingly did not affect other the reciprocal obligations that pertained to the previously existing terms of the ARRA contract entered by Spirit Lake and the Office. Instead, the Amendments added new sets of obligations for the government and Spirit Lake, as well as new parties. Because the Amendments were, in essence, separate aspects of the ARRA contract, they may be declared void without affecting the validity of separable portions of the ARRA contract. *Cf. Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999); *Champlin Ref. Co. v. Corporation Comm'n of State of Okla.*, 286 U.S. 210, 234 (1932) ("The unconstitutionality of a part of an act does not necessarily defeat or affect the validity of its remaining provisions. Unless it is evident that the [l]egislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.").

the agreement between the FHWA and the Office should be dismissed because an interagency agreement is not enforceable in this court. Def.'s Mot. at 36-38. It also argues that the claims regarding the ARRA contract should be dismissed because Council cannot be a third-party beneficiary to agreements that were invalid because Ms. Forcia did not have the authority to bind the government to them. Def.'s Reply in Support of its Mot. to Dismiss or, in the Alternative, Mot. for Summary Judgment ("Def.'s Reply") at 7-8.

A. *The Agreement Between FHWA and the Office*

The inter-agency agreement between FHWA and the Office in 2009 allowed the Office to use $1.5 million of the funds allocated to FHWA by ARRA to "provide support to disadvantaged tribes and tribal members to increase their participation in the highway construction workforce." Def.'s Mot. App. at A126-27. In pertinent part to this action, the statement of work lists the Council as a "key partner," *id.* at A136, A139, and notes that $500,000 of the $1.5 million available funds would be allocated to Council to "provide funding for the [NCCI] that will be conducting on-site apprenticeship training programs to at least 6 tribes," *id.* at A143.

The government argues that "interagency agreements are not enforceable contracts," Def.'s Mot. at 36 (heading, capitals omitted), and thus that the Council has no rights as a purported third-party beneficiary to the FHWA-Office agreement to allocate ARRA funds. *Id.* at 36-37. A hallmark of the third-party beneficiary rule "is that the party standing outside of privity by contractual obligation stands in the shoes of a party within privity." *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999). This argument by the government thus follows the "long-recognized general principle that no person may sue himself." *United States v. Interstate Commerce Comm'n*, 337 U.S. 426, 430 (1949). The Council responds that the agreement between the Office and FHWA would be enforceable because it obligates funds, and a failure to transmit the funds would provoke a "typical breach of contract suit" like one litigated in court. Pl.'s Cross-Mot. at 22. To support its contention, the Council points to an observation by this court in a contractual dispute involving the Tennessee Valley Authority and the United States that "[t]his is not a fight over policy. It is a dispute over money. . . . Who will absorb the cost of DOE's failure to perform the contract, the Treasury, or TVA's rate payers?" *See id.* at 21 (quoting *Tennessee Valley Auth. v. United States*, 51 Fed. Cl. 284, 286 (2001)). The Council's argument is unavailing. Here, FHWA and the Office do not possess the requisite independent identities necessary for a justiciable interagency case or controversy. Unlike the Tennessee Valley Authority, FHWA and the Office do not possess corporate charters; nor do they have the power to sue and be sued in their own names.[18]

---

[18]This court has entertained breach of contract actions brought by the Tennessee Valley Authority against the United States. *See Tennessee Valley Auth. v. United States*, 51 Fed. Cl. 284; *Tennessee Valley Auth. v. United States*, 13 Cl. Ct. 692 (1987). In these cases, the court allowed the suits to proceed because TVA has a sufficiently independent identity — namely, it possesses a corporate identity separate from the executive branch. *See Tennessee Valley Auth.*, 51 Fed. Cl. at 286 ("This commercial nature of the controversy — a traditional breach of contract claim seeking money damages — *makes more significant the ways in which TVA is independent*. TVA can contract, sue and be sued, and represent itself in court. Those aspects of independence are precisely the characteristics implicated here.") (emphasis added); *Tennessee Valley Auth.*, 13

Furthermore, one of the recent TVA cases involved a contract between TVA and the Department of Energy which mirrored contracts between private utilities and the Department. *See* 51 Fed. Cl. at 285-86. By contrast, the agreement between FHWA and the Office has no counterpart in any contract involving a private party. Rather, that agreement memorialized FHWA's commitment to transfer a portion of its allocation of ARRA funds to the Office so that the money could be more easily used to fulfill Congress's intended purpose — *i.e.*, indirectly to invest in transportation projects at Indian reservations. *See* Def.'s Mot. App. at A126-27; American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, 123 Stat. 115, at tit. XII (allocating $550 million to the FHWA "for investments in transportation at Indian reservations and [f]ederal lands"). Accordingly, a suit between FHWA and the Office concerning the agreement would not be justiciable.

Because FHWA could not bring suit against the Office in this court, the Council cannot stand in the shoes of FHWA and do so. As such, the Council's third-party beneficiary claim regarding the agreement between the Office and FHWA must be dismissed.

B. *Amendments 2 and 6 to the ARRA Contract*

Amendments 2 and 6 to the ARRA Contract purport to be contracts in their own right, with the Council as the principal performing party. If the Council is not party to an express contract with the Office and Spirit Lake, then it argues that it is the designated third-party beneficiary of those contracts. Pl.'s Cross-Mot. at 6, 17-21.

The CDA states that a "contractor" pursues a claim by appealing to an agency board, 41 U.S.C. § 7104(a), or by "bring[ing] an action directly on the claim in the United States Court of Federal Claims," 41 U.S.C. § 7104(b)(1). The CDA defines contractors as "part[ies] to a [f]ederal [g]overnment contract other than the [f]ederal [g]overnment." 41 U.S.C. § 7101(7). Thus, the Federal Circuit has held that "those who are not in privity of contract with the government cannot avail themselves of the CDA's *appeal* provisions." *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1371 (Fed. Cir. 2009) (emphasis added) (citing *Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1350-52 (Fed. Cir. 2002); *Admiralty Constr., Inc. by Nat. Am. Ins. Co. v. Dalton*, 156 F.3d 1217, 1220-21 (Fed. Cir. 1998); *Erickson Air Crane Co. of Wash., Inc. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984)).[19] The Federal Circuit has also held that "subcontractors are generally not in privity of contract with the government." *FloorPro, Inc.*, 570 F.3d at 1371. The exception is that "there can be privity of contract between the government and subcontractors where the prime contractor is a mere government agent." *United States v.*

---

Cl. Ct. at 699 ("TVA has a separate corporate identity and possesses the power to enter into binding contracts for the provision 'of electric utility services.' This contractual authority is not limited to TVA's contracts with ratepayers other than DOE. TVA also has the authority to sue for enforcement of its contracts, and its litigation authority is independent of the Department of Justice.") (internal citations omitted).

[19]Under the CDA, a contractor may challenge a contracting officer's decision either by filing an "appeal" to an agency board, 41 U.S.C. § 7104(a), or by bringing an action *de novo* in this court. 41 U.S.C. § 7104(b)(1).

*Johnson Controls, Inc.*, 713 F.2d 1541, 1551 (Fed. Cir. 1983).  Three factors should be present to demonstrate an agency relationship: the prime contractor was "(1) acting as a *purchasing* agent for the government, (2) the agency relationship between the government and the prime contractor was established by clear contractual consent, and (3) the contract stated that the government would be directly liable to the vendors for the purchase price." *Id.*  Where this exception is not present, the Federal Circuit has held that an agency board of contract appeals "has no jurisdiction over a claim brought by a subcontractor who is a third-party beneficiary of a contract between the government and the prime contractor." *FloorPro, Inc. v. United States*, 680 F.3d 1377, 1380 (Fed. Cir. 2012) (citing *FloorPro*, 570 F.3d at 1371-73).

The Federal Circuit has nonetheless indicated that this court may possess jurisdiction over third-party beneficiary claims through Paragraph (a)(1) of the Tucker Act, 28 U.S.C. § 1491(a)(1), rather than under the CDA and Paragraph (a)(2) of the Tucker Act.  *See, e.g., FloorPro*, 680 F.3d at 1380 ("We observed, however, that the grant of jurisdiction to the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1), 'is broader' than the jurisdiction of the [Armed Services Board of Contract Appeals] under the CDA, and can potentially extend to an intended third-party beneficiary of a government contract.") (quoting *FloorPro*, 570 F.3d at 1372, and citing *D & H Distributing Co. v. United States*, 102 F.3d 542, 546-48 (concluding that a third-party beneficiary of a government contract had the right to enforce a contract provision in the Court of Federal Claims)).  As the court of appeals observed in *D & H Distributing*, "Although the parties debate the scope of third party beneficiary principles as applied to government contracts, it is not necessary to explore the outer bounds of third party beneficiary rights in order to resolve this case.  In the case of a contract in which the promisee provides goods or services to the promisor, it has long been settled that a clause providing for the promisor to pay the proceeds of the contract to a third party is enforceable by the third party where the payment is intended to satisfy a present or future liability of the promisee to the third party." 102 F.3d at 546-47; *see also Flexfab, LLC v. United States*, 62 Fed. Cl. 139, 145 (2004) ("[W]hile subcontractors like Flexfab generally have no cause of action under the CDA, this court has jurisdiction over Flexfab's third-party beneficiary claim."), *aff'd*, 424 F.3d 1254 (Fed. Cir. 2004).  Accordingly, this court possesses jurisdiction over the Council's third-party beneficiary claim pursuant to Paragraph (a)(1) of the Tucker Act, 28 U.S.C. § 1491(a)(1).

As discussed *supra* pp.14-17, however, Amendments 2 and 6 violated ISDA and are consequently unenforceable.  Again, a tenet of third-party beneficiary claims "is that the party standing outside of privity by contractual obligation stands in the shoes of a party within privity." *First Hartford Corp. Pension Plan & Trust*, 194 F.3d at 1289.  Because this court has found that Amendments 2 and 6 would be unenforceable by either the government or Spirit Lake, the Council cannot attempt to stand in place of Spirit Lake and successfully enforce the contract.[20]

---

[20]The nature of the ARRA contract has engendered a dispute regarding whether Spirit Lake is a necessary party to this action under RCFC 19(a). *See* Hr'g Tr. 23:17 to 24:15; 68:4 to 69:17; 79:3-18.  Under Rule 19(a), a required party must be joined "if feasible."  RCFC 19(a).  Because Indian tribes possess sovereign immunity, joinder of a tribe is not feasible unless the tribe waives its immunity or the suit is authorized by Congress. *See Oklahoma Tax Comm'n. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) ("Indian tribes are

21

As such, Council's third-party beneficiary claims premised upon Amendments 2 and 6 of the ARRA contract must be dismissed.

## II. *Recovery in* Quantum Meruit

In the alternative, Council seeks to recover in *quantum meruit* $110,000 "for the provision of NCCI construction worker training to the Shoshone-Paiute Tribe" under the terms set out by Amendment 2. *See* Compl. ¶ 105; *see also* Def.'s Mot. at A115-16 (Amendment 2 Statement of Work). At common law, *quantum meruit* provided for "quasi-contractual" recovery for the value of services rendered. *Fluor Enters. Inc.*, 64 Fed. Cl. at 495 n.31. Recovery in *quantum meruit* is generally based upon contracts implied-in-law, over which this court does not possess jurisdiction, but an exception arises in situations "in which the plaintiff provided goods or services to the government pursuant to an express contract, but the government refused to pay

---

'domestic dependent nations' that exercise inherent sovereign authority over their members and territories. Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation.") (internal citations omitted); *see also Citizen Potawatomi Nation v. Norton*, 248 F.3d 993, 997 (10th Cir. 2001). When joinder is not feasible, a court must consider the following factors in determining whether an action may proceed amongst the existing parties:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

RCFC 19(b); *see Klamath Claims Comm. v. United States*, __ F.3d __, __, 2013 WL 4494383, at *4-*5 (Fed. Cir. Aug. 23, 2013) (applying RCFC 19(b)). In this case, Spirit Lake will not be prejudiced by a judgment entered in its absence. "Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.' Issue preclusion, in contrast, bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)) (internal citations omitted). In general, a person who was not a party to a suit has not had a "full and fair opportunity to litigate" the claims and issues settled in that suit, and thus there is a "general rule that 'one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" *Id.* (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). The exceptions to this rule, outlined in more detail in *Taylor*, 553 U.S. at 893-95, are inapplicable to Spirit Lake. Accordingly, *res judicata* would not bar Spirit Lake from later action with regard to its contractual interests, and it will not be prejudiced by a judgment entered in its absence. Nor will Council or the government be prejudiced by a judgment entered in Spirit Lake's absence.

for them because of defects in the contract that rendered it invalid or unenforceable." *Perri v. United States*, 340 F.3d 1337, 1344 (Fed. Cir. 2003). In such cases, *quantum meruit* permits the contractor to be "compensated under an *implied-in-fact contract* when the contractor confers a benefit to the government in the course of performing a government contract that is subsequently declared invalid." *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995) (emphasis added); *see United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986) ("Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated *under* the contract, but rather under an implied-in-fact contract.") (emphasis in original).

For an implied-in-fact contract to exist, "[a] plaintiff must show: (1) mutuality of intent to contract, (2) consideration, (3) unambiguous offer and acceptance, and, (4) if the United States is a party to the contract, plaintiff must also show that the party who entered the contract on behalf of the United States had actual authority to bind the government." *Bussie v. United States*, 96 Fed. Cl. 89, 98 (2011) (citing *Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009)), *aff'd*, 443 Fed. Appx. 542 (Fed. Cir. 2011). Because Ms. Forcia did not possess the authority to bind the government to Amendments 2 or 6, *see supra* pp. 14, 17, the Council cannot demonstrate the existence of an implied-in-fact contract on which to base *quantum meruit* recovery. Its claim for such recovery must accordingly be denied.

## CONCLUSION

For the reasons stated, the government's motion to dismiss or, in the alternative, motion for summary judgment is GRANTED. The plaintiff's motion for partial summary judgment is DENIED. The complaint shall be dismissed pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.

The clerk shall enter judgment for the defendant.

No costs.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge